Mary GLOVER, et al., Plaintiffs,

v.

Perry JOHNSON, et al., Defendants.

No. 77–CV–71229.

United States District Court,
E.D. Michigan,
Southern Division.

April 29, 1994.

Deborah LaBelle, Martin Geer, Detroit, MI, for plaintiffs.

David Edick, Asst. Atty. Gen., Corrections Div., Lansing, MI, for defendants.

## OPINION AND ORDER

FEIKENS, District Judge.

### I. INTRODUCTION

Before me is Plaintiff Class' Motion for Injunctive Relief to Compel Compliance with this Court's Orders Regarding Access to Courts and Contempt Remedies. This motion is in response to Michigan Department of Corrections' (the "Department" or the "State") decisions to reduce funding to Prison Legal Services of Michigan ("PLS"), the agency which provides legal assistance to female inmates, and to reduce the scope of PLS services so as to exclude assistance in parental rights matters after February 28, 1994. Plaintiff class consists of all women prisoners in Michigan.

Plaintiff class argues that the decrease in PLS funding and the prohibition against assistance in the area of parental rights constitute contempt of this court's previous orders and a denial of women prisoners' meaningful access to the courts. Additionally, it raises as a new issue the constitutional right of

female inmates to legal assistance and access in the area of parental rights, apart from this court's previous decision in *Glover v. Johnson*, 478 F.Supp. 1075 (E.D.Mich.1979) ("*Glover I*") and the decision of the United States Court of Appeals for the Sixth Circuit in *Knop* and *Hadix*[1] Defendants argue they are not in contempt because the decision in *Knop* and *Hadix* supports their conclusion that they are not required to provide access to courts for the purpose of exercising or defending parental rights. Therefore, defendants argue, the *Knop* and *Hadix* decision authorizes unilateral modification of the scope of services provided by PLS.

On April 4, 1994, I convened a hearing to determine whether defendants were in contempt of this court's previous orders and to determine whether facts existed which would justify injunctive relief. Specifically, I sought to determine whether denial of legal assistance in parental rights matters would produce irreparable harm to plaintiff class and why the harm to plaintiff class, if any, outweighed any potential harm to defendants. I also ordered the parties to submit "Proposed Findings of Facts and Conclusions of Law" with citations to the hearing record. Approximately three days of testimony was taken.[2]

This opinion addresses three issues raised in plaintiff class' motion and the corresponding hearing. The first issue addressed is plaintiff class' contention that defendants are in contempt of this court's previous orders. Second, in examining the facts in the record, I must determine whether the injunctive relief requested is justified. Finally, I address plaintiff class' argument that they have a constitutional right to legal assistance in parental rights matters.

## II. ORDERS IN EFFECT

### A. Background

█ The issues before me are added to a continuum of issues which have been ad-

dressed since this case was first decided in 1979. In *Glover I*, I found, in addition to various equal protection violations, that women prisoners were not being provided with "meaningful" access to the courts, although the law library at the Huron Valley Women's Facility[3] was approaching adequacy under the standard set forth in *Bounds v. Smith*.[4] In order to protect women inmates' right to access, I ordered the State to continue the PLS effort at the Huron Valley Women's Facility, in addition to providing adequate law libraries. *Glover I* at 1097.

### B. Findings of Fact

The 1978/1979 contract between PLS and the Department, which I ordered continued, required PLS to provide legal assistance to women prisoners in child custody disputes and/or neglect actions, as well as other matters. (Plaintiff Class Exh. 9 at 1.) Defendants have never sought modification of this order and have continued to fund PLS to provide assistance in the area of parental rights in 1980, 1981 and 1982 to both men inmates and the plaintiff class. (Plaintiff Class Exhs. 7, 8.) Defendants also continued funding PLS to provide assistance in the area of parental rights through 1991 without a contract. (Testimony of Sandra Girard, April 4, 1994.)

On August 12, 1991, after finding that defendants had still not remedied fully the access violations found in 1979, I entered an interim order requiring defendants to contract with PLS to provide on-site services at all facilities and camps housing women prisoners, pending: the completion of paralegal training; the development of an adequate pool of writ-writers; and the demonstration by defendants of plaintiff class' adequate access to the courts. (Interim Order of August 12, 1991.) Consistent with proceedings held

---

**1.** *Knop v. Johnson*, 977 F.2d 996 (6th Cir.1992). This decision consolidated the appeal in two class actions, *Knop v. Johnson* and *Hadix v. Johnson*. The case is referred to as "*Knop* and *Hadix*" throughout this opinion.

**2.** The hearings occurred on April 4, 6, and 12, 1994.

**3.** This was the only prison for women at the time.

**4.** 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).

on August 22, 1991, the August 12, 1991, Interim Order was to continue through November 22, 1991, the date on which defendants' remedial plan was to be submitted to the court. (September 12, 1991, Order Amending August 12, 1991 Interim Order for Programming.) At a hearing held on November 19, 1991, I determined that the Interim Order of August 12, 1991, would remain in effect indefinitely pending the report on the remedial program and the steps that would occur thereunder. (Court Transcript of November 19, 1991, p. 72.) Defendants have never sought modification of the August 12, 1991, Interim Order.

On January 6, 1992, defendants entered into a one-year contract with PLS to provide assistance in various areas including child custody, child visitation and parental neglect. (Plaintiff Class Exhs. 6a, 6b and 6c.) This contract, and the services provided thereunder, was specifically entered into for the purpose of complying with this court's previous orders. Its *Statement of Purpose* is significant:

> Whereas the STATE desires to establish a system that will provide indigent female offenders currently incarcerated at the ... Facility with selected legal services *as ordered by the court* in *Glover v. Johnson.* The purpose of this agreement is to engage the technical and professional services of the CONTRACTOR in advancement of this work, and to define the terms and conditions of this undertaking.
>
> . . . . .
>
> 3. The areas of law in which services are to be provided are:
>
> a. *Domestic relations including divorce, child custody, visitation disputes, and child neglect actions;*

*Id.* (Emphasis added.)

This is the crux of this case. For years, through PLS lawyers, inmate mothers in parental rights cases could contact the court or the agency involved and those PLS lawyers and their paralegal assistants did provide the bridge for these inmate mothers. PLS lawyers (they did not go into court) could obtain either pro bono or court-appointed lawyers for the inmate mothers, where necessary.

The 1992 contract provided for three full-time staff attorneys, one of whom specialized in the area of parental rights, (Plaintiff Class Exhs. 6a, 6b and 6c at the appendices), to provide legal services to all women inmates in Michigan in various areas including parental rights. Defendants contracted with PLS to provide assistance in the area of parental rights until 1994. (Testimony of Sandra Girard, April 4, 1994.) The 1994 contract provided that funding for services in the area of parental rights would conclude on February 28, 1994. (Plaintiff Class Exhs. 3, 4.)

### C. *Conclusion*

Because defendants have not sought modification of my previous orders and unilaterally have eliminated this assistance, they are in contempt. The Interim Order of August 12, 1991, which supplemented my 1979 Opinion and Order, is still in effect. *Glover I,* 478 F.Supp. 1075 (1979); Interim Order of August 12, 1991; September 12, 1991, Order Amending August 12, 1991 Interim Order for Programming; Court Transcript of November 19, 1991, p. 72.

### D. *Injunctive Relief*

"[I]n granting or refusing interlocutory injunctions the court shall ... set forth findings of fact and conclusions of law which constitute the grounds of its action." Fed. R.Civ.P. 52(a). The facts which follow are in addition to the findings of fact at II.B., *supra.*

#### 1. *Findings of Fact*

As a result of their confinement, incarcerated women are unable to exercise their parental rights and legal responsibilities in making decisions regarding the care and placement of their children over whom they have legal custody. The inability to structure alternative care arrangements during their incarceration subjects incarcerated mothers to increased risk of loss of legal custody of their children and subsequent termination of parental rights. (Testimony of Lisa D'Aunno, April 6, 1994.)

Specifically, the conditions of confinement imposed by defendants control, and limit the

mothers' exercise of their parental rights and custodial responsibilities. (Testimony of Lisa D'Aunno, April 6, 1994.) Paralegals in the prison population are not adequately trained to deal with parental rights matters and telephone access to the courts is restricted, making it impossible to obtain outside counsel and maintain the outside contact necessary in parental rights matters. (Testimony of Lisa D'Aunno and Gail Grieger, April 6, 1994.) Defendants' policies constitute an additional barrier to the inmates' ability to exercise their parental rights and responsibilities without outside assistance.

### 2. *Conclusion*

Plaintiff Class' Motion for Injunctive Relief is granted. Because members of plaintiff class and their children will suffer irreparable harm if legal assistance in parental rights matters is discontinued, and because this harm would clearly outweigh any potential harm to defendants, defendants are enjoined from unilaterally changing or modifying in any way the staffing of PLS and the areas in which PLS provides services to women inmates, absent a motion to modify or to seek leave of this court. Fed.R.Civ.P. 60(b). Staffing levels and areas of assistance must comply with orders and terms provided in the 1992 contract.

### III. *CONSTITUTIONAL RIGHT TO LEGAL ASSISTANCE IN PARENTAL RIGHTS MATTERS*

█ Additionally, both parties have framed an issue as to the existence of a constitutional right of female inmates to court access and legal assistance in parental rights matters. A factual hearing was held to ascertain whether a sufficient factual basis exists on which a decision could be based.[5] Plaintiff class argues that parental rights are afforded protection under the U.S. Constitution. It argues that it is entitled to, and defendants are obligated to provide, legal assistance in parental rights matters. Defendants argue that pursuant to the decision of the United States Court of Appeals for the

Sixth Circuit in *Knop* and *Hadix,* access to the courts and/or legal assistance in matters involving parental rights is not constitutionally mandated. Alternatively, in defense of their decision to discontinue legal assistance in parental rights matters, defendants argue that the *Knop* and *Hadix* decision supports their conclusion that the Department can determine the form of legal assistance to be provided. Therefore, defendants argue, because women's prison facilities have adequate law libraries and some paralegal assistance, there is meaningful access to courts as required by the U.S. Supreme Court in *Bounds.*

For the reasons that follow, I conclude that the *Knop* and *Hadix* decision does not address the scope or form of legal assistance provided to female inmates and is therefore not applicable in this case. In the area of parental rights, legal assistance is required because the provision of an adequate law library and some paralegal assistance, alone, is insufficient to provide meaningful access to the courts. I conclude that the maintenance of parenthood is a fundamental right which is entitled to protection under the Constitution. Incarcerated mothers have a right to, and the Department is obligated to provide, legal assistance in parental rights matters affecting their children so as to be able to be represented in court.[6]

### A. *Knop and Hadix Decision As Limiting the Scope and Form of Legal Access and Assistance to Women Inmates*

The first issue presented for appeal in *Knop* and *Hadix,* 977 F.2d 996 (6th Cir. 1992), was whether the district courts had erred in finding, as both did, that Michigan prisoners had been denied their right of access to the courts. The U.S. Court of Appeals for the Sixth Circuit supported the conclusions of the district courts:

> [O]n the record before us, and finding no clear error in the facts as determined by the district courts in their thorough and well-crafted opinions, we are satisfied that there are at least some Michigan prisoners

---

**5.** *See supra* note 2 and accompanying text.

**6.** PLS lawyers are vital in getting pro bono or court-appointed attorneys for the inmate mothers.

who have been denied the type of access to the courts required under the current Supreme Court doctrine.

*Id.* at 999. The applicability of *Knop* and *Hadix* to the issues presented in this motion ends at this point. Defendants contend that pursuant to *Knop* and *Hadix,* the State has no obligation to provide legal assistance to women inmates in the area of parental rights. The error in defendants' reading of *Knop* and *Hadix* in the first instance is that those cases dealt with the rights of male prisoners. The court of appeals did not address the areas in which legal assistance would or would not be required for women prisoners. As discussed below, the court specifically recognized that access considered "meaningful" to male inmates might not constitute meaningful access for women inmates. *Id.* at 1004 n. 5. The same point applies to the areas in which legal assistance is provided to women prisoners. As relates to male prisoners, the court of appeals would restrict the types of legal matters to which affirmative assistance extends to: "[1] collateral attacks upon their convictions and [2] for challenging the conditions of their confinement." *Id.* at 1009. There is no basis to conclude that this same limitation would be placed on female prisoners, particularly, when they are faced with the loss of a fundamental right, the right to the custody of their children.

The second question answered by the court of appeals was how far the State must go to affirmatively assist prisoners in gaining meaningful access to the courts. The court concluded that "access to the courts need not entail access to an attorney; access to an adequate law library, *or* to paralegal personnel with access to such a library would be sufficient [sic]." *Id.* at 999. (Emphasis added.) The court of appeals found that the district court in *Hadix,* particularly, had gone too far in requiring, as part of that plaintiff class' remedy that the Department provide both a constitutionally sufficient law library *and* a staff of attorneys. Defendants argue this supports their conclusion that it can choose to provide an adequate library only with some inmate paralegal assistance.

Since there are adequate law libraries at the women's prison facilities and some paralegals, defendants believe legal assistance is not required.

The error, in defendants' reading the *Knop* and *Hadix* decision as limiting legal assistance in this case, is that the decision did not address access to the courts by women prisoners. In discussing what is necessary to provide meaningful access, the court specifically pointed out that in the case of women prisoners, the requirement may need to be read in the "conjunctive" rather than the "disjunctive": "Where female prisoners lack their male counterparts' history of 'self-help' in the law, however, *equal protection considerations may require that library facilities be supplemented by assistance from a lawyer.*" *Id.* at 1004 n. 5. (Emphasis added.) The court of appeals acknowledged that what constituted meaningful access to male prisoners might not be sufficient to provide "meaningful" access to female prisoners. Chief Judge Engel's concurring opinion in *Glover v. Johnson* ("*Glover II*"), 855 F.2d 277 (6th Cir.1988), made the point clearly:

> Equal protection is not the same as identical treatment, for identical treatment may indeed result in very unequal protection. Nor is exact mathematical parity of financial per capita expenditure to be similarly equated. [T]here are many and significant differences between the sexes and there is nothing humanity can do about them ... The task of an even-handed penological system responsible for the confinement of both sexes is to adjust realistically to such differences without temptation to use them to mask latent bias or uncorroborated assumptions.

*Id.* at 288. Although the appeal in *Glover II* involved facts and issues different from those presented here, Judge Engel's point addresses the caution which must be exercised when analogizing and comparing remedies, as well as rights, of men and women prisoners. Simply because the court in *Knop* and *Hadix* would not require legal assistance [7] *and* an adequate law library for male prisoners does

---

7. A distinction must be kept in mind as to the difference between PLS's lawyers (legal assis-

tants) and inmate paralegals.

not automatically mean that this same limitation applies to female inmates faced with a similar problem of access.

### B. *Meaningful Access Consistent With "Bounds"*

It is well settled that prisoners have a fundamental right to access to courts which requires prison authorities to assist inmates in the preparation and filing of legal papers. *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977). This fundamental right is generally protected by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law. The issue in *Bounds* was whether law libraries or other forms of legal assistance are needed to give prisoners a reasonably adequate opportunity to present claimed violations of constitutional rights to the courts. *Id.* at 817, 97 S.Ct. at 1491. The issue in this case as relates to *Bounds* is what type of legal assistance is adequate to give prisoners meaningful access to the courts for the purpose of exercising and/or defending challenges to their parental rights.

#### 1. *Findings of Fact*

Matters pertaining to a mother's exercise of her parental and custodial rights may be raised in any of three state courts: circuit, probate or juvenile. (Testimony of Lisa D'Aunno, April 6, 1994.) These three courts have both concurrent and overlapping jurisdiction. Each of these three courts also has a different social and/or investigative agency attached to it such as Friend of the Court, Department of Social Services and Child Protective Services. Each court and its corresponding agency has special procedures, which often are not codified, that must be followed before a matter will be heard or acted upon such that gaining access to the juvenile, probate or circuit courts for the purpose of exercising parental rights is impossible for an incarcerated woman to do without assistance from an attorney. There are various informal levels of correspondence/communication which must take place between the parent and the agency before the respective court will determine if a hearing will be held. The hearing or action will usually take place upon the recommendation of the respective agency and the disposition of the issue is usually determined by the recommendation of the particular agency.

In addition to the structure of the probate, juvenile and circuit courts, the policies and practices of the Department are a barrier to women inmates obtaining access to the courts for the purpose of exercising their parental rights. In the area of family law and parental rights, telephone calls to case workers, the probate, juvenile and circuit courts, and their respective investigative agencies, care-givers, and potential care-givers, are imperative. The Department prohibits prisoners from making direct telephone calls and neither the courts nor their respective agencies accept collect telephone calls. This policy also forms a barrier that prohibits adequately trained writ-writers, if any existed in the women's facilities, from providing effective assistance. The inability to exercise parental rights and responsibilities subjects incarcerated mothers to increased risk of the loss of custody and termination of parental rights.

#### 2. *Conclusion*

Defendants argue that because adequate law libraries are in place with some inmate paralegals, there is no obligation to further assist inmate mothers. This argument misses the whole point of *Bounds:* "Meaningful Access" is the key. *Bounds,* 430 U.S. at 823, 97 S.Ct. at 1495. Meaningful access is the ability to be heard "to get your foot in the door". Although defendants argue that female inmates have access to the courts, because they have at their disposal an adequate law library and some inmate paralegals, and presumably can file various pleadings with the court, the structures of the various courts in the area of parental rights prevent meaningful access by incarcerated persons through the filing of papers alone.

The point of *Bounds* was that prison authorities must assist prisoners in gaining access to courts to protect fundamental constitutional rights. "Meaningful Access" is the touchstone. In this case there can be no meaningful access without the assistance of an attorney who is able to interface with the

court and its respective agency. PLS, through its legal assistance to the inmate mothers, provides the vital method by which a pro bono or court-appointed attorney can represent the inmate mothers in court. In addition, an attorney is needed in the event that the inmate is not able to obtain a writ ordering her appearance at the various informal proceedings.[8]

## C. Constitutional Right To Legal Assistance in Parental Rights Matters

█ Plaintiff class argues it has a constitutional right to meaningful access to the courts to protect fundamental parental rights. (Plaintiff Class Conclusions of Law at 4.) In this instance, meaningful access can only be achieved with legal assistance. Defendants do not dispute that parenthood is a fundamental right but argue access to the courts and/or legal assistance in parental rights matters is not constitutionally mandated. (Defendants' Findings of Fact and Conclusions of Law at 6.) The Due Process Clause of the Fourteenth Amendment guarantees certain freedoms which are key to the determination of the issue raised by the parties: "No State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The Supreme Court recognized in *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), that the "liberty" guaranty had not been specifically defined, but noted it definitely included parenthood: "Without doubt, it denotes not only freedom from bodily restraint but also the right of the individual to ... marry, establish a home *and bring up children.*" *Id.* at 399, 43 S.Ct. at 626. (Emphasis added.) The Supreme Court has made it clear on more than one occasion that a parent's right to the "companionship, care, custody, and management" of his or her child's life is an important interest that undeniably warrants deference and, absent a powerful countervailing interest, protection. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct.

1208, 1212, 31 L.Ed.2d 551 (1972). *See also Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."); *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942) (the rights to conceive and raise one's children are basic civil rights). Thus it is clear from Supreme Court precedents that parenthood is a fundamental right which is entitled to due process protection under the Constitution.

Defendants are correct in their assertion that the Constitution does not require automatic appointment of counsel in parental rights proceedings. The Constitution requires "due process." Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the Fourteenth Amendment. *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). Due process is flexible and calls for a variety of procedural protections depending upon the particular situation. *Id.* at 334, 96 S.Ct. at 902. In determining what procedure is adequate to provide due process, it is necessary to determine of what fundamental fairness consists in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake. *Lassiter v. Department of Social Services of Durham County*, 452 U.S. 18, 25, 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640 (1981).

The general rule gleaned from Supreme Court precedents on an indigent's right to appointed counsel is that such right has been recognized to exist only where the litigant may lose his or her physical liberty if he or she loses the litigation. *Id.* Thus it is the litigant's interest in personal freedom which triggers the right to appointed counsel. *In*

---

8. Under Michigan law a prisoner may have the right to be present at termination proceedings only. M.C.R. 5.973(A)(3)(b); M.C.L. 712A.19(4)(b). Due process does necessarily require the presence of an incarcerated parent at a termination hearing. *In re Vasquez*, 199 Mich.

App. 44, 49, 501 N.W.2d 231 (1993). If, through the exercise of diligent effort, the presence of the prisoner at the termination hearing cannot be secured, the hearing may be held in the prisoner's absence. M.C.R. 5.973(A)(3)(b); M.C.L. 712A.19(4)(b).

*re Gault,* 387 U.S. 1, 34, 87 S.Ct. 1428, 1447, 18 L.Ed.2d 527 (1967). As the litigant's risk of loss of personal freedom diminishes, so does the right to appointed counsel. *See e.g., Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Scott v. Illinois,* 440 U.S. 367, 99 S.Ct. 1158, 59 L.Ed.2d 383 (1979). All other elements in the due process decision must be measured against this presumption. *Lassiter,* 452 U.S. at 27, 101 S.Ct. at 2159.

The Court in *Mathews v. Eldridge,* provided three elements (the "Eldridge factors") which must be balanced in determining what the due process right requires, when physical liberty is not threatened: (1) the private interests at stake, (2) the risk that the procedures used will lead to erroneous decisions and the value of additional or substitute procedural safeguards, if any, and (3) the government's interest, both fiscal and administrative. 424 U.S. at 335, 96 S.Ct. at 903. In the area of parental rights, the decision whether due process calls for the appointment of counsel for indigent parents in termination proceedings [9] is answered in the first instance by the trial court subject to appellate review. *Lassiter v. Department of Social Services of Durham County,* 452 U.S. 18, 32, 101 S.Ct. 2153, 2162, 68 L.Ed.2d 640 (1981).

The Court in *Lassiter* applied the "Eldridge factors" in determining whether an incarcerated mother, who claimed she was indigent, had been denied due process under the Fourteenth Amendment. The petitioner's request for appointed counsel at a parental rights termination hearing had been denied. *Id.* at 22, 101 S.Ct. at 2157. A termination hearing was held and petitioner's parental rights were terminated. *Id.* at 24, 101 S.Ct. at 2158.

Applying the first Eldridge factor, the Court in *Lassiter* determined that the private interest at stake was the petitioner's risk of loss of the care, custody and companionship of her child. *Id.* at 27, 101 S.Ct. at 2159. As a result, a parent has a strong interest in the accuracy and justice of the decision to terminate his or her parental rights. *Id.* The same risks apply to plaintiff class. As of 1993 only 10% of female inmates were married; whereas 64% had dependents/children. (Plaintiff Class Exh. 31 at 4 and 5); (Exh. 9 to Plaintiffs' Motion for Injunctive Relief and to Compel Compliance). The majority of the children are minors at the time of the inmates' incarceration. *Id.* In addition, far more often than their male counterparts, women inmates have legal custody of their children and are the primary caretakers at the time of their incarceration.[10] (Testimony of Lisa D'Aunno, April 6, 1994; *1994 Bureau of Justice Report on Women in Prison.*) Because of differences in the roles of male and female inmates in the lives of their children, placement of children issues are more significant for incarcerated mothers than incarcerated fathers. (*Unheard Voices: A Report on Women in Michigan County Jails;* Plaintiff Class Exh. 11 to Motion For Injunctive Relief at 64.) The conditions of confinement prevent plaintiff class from making decisions regarding the placement and alternative care of their

---

**9.** It has also been argued that an indigent parent may be entitled to the assistance of appointed counsel not only in parental termination proceedings, but in dependency and neglect proceedings as well. *Lassiter* at 34, 101 S.Ct. at 2163 (quoting from IJA–ABA Standards for Juvenile Justice, Counsel for Private Parties 2.3(b) (1980); U.S. Dept. of HEW, Children's Bureau, Legislative Guide for Drafting Family and Juvenile Court Acts at 25(b) (1969); National Council on Crime and Delinquency, Standard Juvenile Court Act at 19 (1959)). Several courts have specifically held that indigent parents may also have a right to appointed counsel in proceedings other than termination of parental rights. *E.g., Davis v. Page,* 640 F.2d 599 (5th Cir.1981) (en

banc); *Cleaver v. Wilcox,* 499 F.2d 940 (9th Cir. 1974); *Smith v. Edmiston,* 431 F.Supp. 941 (W.D.Tenn.).

**10.** The Governor of this State has recognized this reality: "*Unheard Voices: A Report on Women in Michigan County Jails* recognizes that most female offenders are incarcerated for non-violent, often economically motivated crimes. Most are the primary caretakers of their children.... [T]hey must also return to their homes and communities with the ability to provide for themselves and their children." (Letter from Governor John Engler to a Concerned Citizen (7/19/93), Exhibit 11 to Plaintiff Class' Motion to Compel Injunctive Relief).

children during their period of incarceration. Most alternative care arrangements require some legal proceeding or transfer of custodial authority. (Testimony of Lisa D'Aunno, April 6, 1994.) This, added to the fact that most prisoners are indigent at the time of arrest and cannot afford to hire private counsel, subjects incarcerated mothers to increased risks of loss of custody of their children and the eventual termination of their parental rights due to their inability to exercise parental rights and responsibilities. *Id.* Termination of parental rights results in an absolute denial of any future relationship between a mother and child.

The Court in *Lassiter* also concluded that the state shared the parents' interests in accurate and just decisions and, thus, might also share indigent parents' interests in the availability of appointed counsel. *Lassiter* at 28, 101 S.Ct. at 2160. The state's interests diverge, however, from those of incarcerated parents after this point. The state is interested in making the termination decision as economically as possible and avoiding the expense of lengthened proceedings. *Id.* The presence of appointed counsel may lengthen and complicate the proceedings. This directly conflicts with the state's interest to spend as little money as possible. *Id.* Defendants and plaintiff class, in this case, have conflicting interests also. Termination and other proceedings involving parental rights have, as their primary purpose, the improvement of the quality of life of the affected children. On the other hand, as expressed specifically in this case, defendants refuse to expend funds for Prison Legal Services legal assistants who can obtain appointed counsel for inmate mothers at termination hearings. Defendants do not dispute that counsel would only increase the probability that decisions about the quality of life of the involved children will be the correct ones, but simply do not wish to foot the bill.

As to the final Eldridge factor, the Court in *Lassiter* concluded that the complexity of termination proceedings coupled with the incapacity of an uncounseled parent, in some instances, may make the risk of an erroneous decision high. *Id.* at 30, 101 S.Ct. at 2161. The same conclusion applies to plaintiff class.

The confusion as to the procedures of the three courts which handle parental rights matters alone may lead to erroneous decisions. (Testimony of Lisa D'Aunno, April 6, 1994.) The lack of phone calls to a case worker, in some instances, establishes grounds for termination of parental rights. *Id.* In addition, the inability to be heard or have written papers reviewed by the respective court without first having some sort of relationship with the court's respective agency also increases the risk that a termination proceeding, if and when held, will result in an unfavorable outcome for the uncounseled parent.

The Court in *Lassiter* concluded that the petitioner's due process right had not been denied by the trial court's failure to appoint counsel at her parental rights termination proceeding. *Id.* at 32, 101 S.Ct. at 2162. The Court found that the absence of counsel, on behalf of petitioner, did not render the proceeding fundamentally unfair. *Id.* The Court based its decision primarily on the trial court's finding that the petitioner had expressly declined to appear at a previous custody hearing. *Id.* at 33, 101 S.Ct. at 2163. The Court remarked that in deciding what due process requires, it "need not ignore a parent's plain demonstration that she is not interested in attending a hearing." *Id.*

Applying the reasoning of *Lassiter* to the facts presented in this case, I reach a different result. I conclude, in applying the three Eldridge factors, that access to the court is required to guarantee plaintiff class due process in matters concerning and/or affecting their parental rights. The structure of the various courts as well as the regulations of the Department constitute a barrier to the plaintiff class' exercise of a fundamental right. Plaintiff class members, up until the point PLS services in the area of parental rights were discontinued, actively and effectively exercised their parental rights with the assistance of PLS. (Testimony of Lisa D'Aunno and Gail Grieger, April 6, 1994.) Fundamental fairness requires that legal assistance in the area of parental rights be provided to assure plaintiff class has adequate due process by having that legal assis-

tance serve pro bono or as court-appointed attorneys, when necessary.

The Department advances two arguments in defense of its conclusion: (1) it is not obligated to affirmatively assist women prisoners in the exercise of this fundamental right and (2) parents in the free world do not have the right to legal assistance in the areas requested by plaintiff class. The U.S. Court of Appeals for the Third Circuit, in *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326 (3d Cir.1987), addressed defendants' points, by analogy. *Monmouth* involved the state's obligation to assist women prisoners in exercising the fundamental right of abortion. Relating to defendants' first point, the court recognized that a woman has a fundamental right to choose abortion under *Roe v. Wade*[11] and found that various county policies regarding procedures to receive an abortion limited this right. The court found that the state had an affirmative obligation to assist women prisoners in exercising this fundamental right. *Id.* at 337. The court also recognized that while the Constitution does not require prison officials to adopt the best method of accommodation, the opportunity they provide inmates to exercise the asserted right must be meaningful. *Id.* (quoting *Patterson v. Mintzes,* 717 F.2d 284, 288 (6th Cir.1983)). The court concluded that inmates retain their constitutional right to choose abortion and this right must be accommodated by prison officials if no legitimate, penological objective is thereby compromised. *Id.* at 344.

Generally, the Supreme Court has held that a prisoner retains those constitutional rights that are not inconsistent with his or her status as a prisoner or with the legitimate penological objectives of the corrections system. *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). The right to remain a parent throughout a period of incarceration, therefore, is not forfeited. Just as the plaintiffs in *Monmouth* retained their fundamental right to abortion, plaintiff class members, in this case, retain the fundamental right to seek to retain legal custody of a child (or children) during their period of incarceration. Defendants are obligated to assist plaintiff class in exercising the responsibilities and rights inherent in this status.

As to defendants' second point that people in the free world are not entitled to legal assistance in parental rights matters,[12] the court in *Monmouth* concluded that the government's obligations to the free world were different from its obligations in the prison context. *Monmouth* at 341. For instance, in the prison context, the government is required to provide various items to facilitate the exercise of religion. This would be a violation of the Establishment Clause in the free world. *Id.* Similarly, the government must provide prisoners in its care with minimum standards of food and housing when no similar obligation exists to the many homeless people in this country. *Id.* Last, the government must provide prisoners with medical treatment when there are many people in this country who have no healthcare. "Because of the very fact of incarceration, the Supreme Court has recognized that it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of liberty, care for himself or herself." *Id.* (quoting *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976)). The Court also concluded that the county's obligation to accommodate the rights of its prisoners attached notwithstanding their indigency or wealth. *Id.* at 344. Plaintiff class members are unable to effectively exercise their parental rights by reason of their incarceration. They cannot make the appropriate contact with various

---

**11.** 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

**12.** Defendants' point is also not true. The Michigan State Bar Foundation distributed IOLTA grants to 15 legal services provider organizations in 1992. (Michigan State Bar Foundation "Overview," Plaintiff Class Supplemental Exhibit 1.) These grants are used exclusively to provide services to low income or indigent people. (Affidavit of Robert F. Gillett, Exhibit 5 to Plaintiff Class' Motion for Injunctive Relief.) Thirty-nine percent of the legal services provided by way of these grants was in the area of family matters including child custody, parental rights, and guardianships. (Michigan State Bar Foundation "Overview," Plaintiff Class Supplemental Exhibit 1.)

state agencies, nor can they effectively be heard on custody matters before the respective courts without personal contact through PLS with those courts. The affirmative assistance of defendants is required.

An order providing injunctive relief may be submitted. Such order shall likewise provide that unless immediate compliance, as is requested in this opinion, is made, a hearing on contempt penalties may immediately be sought.

IT IS SO ORDERED.