**Mary GLOVER, et al., Plaintiffs,**

v.

**Perry JOHNSON, et al., Defendants.**

No. 77–CV–71229.

United States District Court,
E.D. Michigan,
Southern Division.

March 14, 1995.

---

Deborah A. LaBelle, Detroit, MI, for plaintiffs.

Susan Przekop–Shaw, Asst. Mich. Atty. Gen., Lansing, MI, for defendants.

## OPINION

FEIKENS, District Judge.

### I. INTRODUCTION

The case of *Mary Glover, et al. v. Perry Johnson, et al.,* as captioned above (ultimately a class action), began on May 19, 1977. The case of *Everett Hadix, et al. v. Perry Johnson, et al.,* Civil Action No. 80–73581 (ultimately a class action), began on September 18, 1980.

In all of the years since these cases were filed until now, the parties have sought this court's active involvement. *See Glover v. Johnson,* 478 F.Supp. 1075 (E.D.Mich.1979); 510 F.Supp. 1019 (E.D.Mich.1981); 855 F.2d 277 (6th Cir.1988); 721 F.Supp. 808 (E.D.Mich.1989); and 934 F.2d 703 (6th Cir. 1991). *See Hadix v. Johnson,* 694 F.Supp. 259 (E.D.Mich.1988); *aff'd* 871 F.2d 1087 (6th Cir.1989); 712 F.Supp. 550 (E.D.Mich.1989); *aff'd in part and rev'd in part, vacated, in part, remanded, sub nom., Knop v. Johnson,* 977 F.2d 996 (6th Cir.1992); *cert. denied, Knop v. McGinnis,* — U.S. —, 113 S.Ct. 1415, 122 L.Ed.2d 786 (1993).

The key result of the several actions in *Glover,* both at the level of this court's involvement and in the U.S. Court of Appeals for the Sixth Circuit, was a 1981 Final Order stemming from a negotiated settlement between the parties and a resultant Remedial Plan dated December 6, 1991. *See Glover,* 934 F.2d at 708. On a parallel track, the various actions outlined in *Hadix* culminated in an Order, filed May 13, 1985, accepting the Consent Judgment (the "Consent Decree" or the "Decree," filed February 13, 1985), and the Out–of–Cell Activity Plan, dated November 9, 1985.

This common introduction to these two cases results from parallel actions initiated by defendant Michigan Department of Corrections (or "Department of Corrections") to modify the Remedial Plan and the Plan for Vocational Programs and Work Pass, in *Glover,* and the 1985 Out–of–Cell Activity Plan mandated by the Consent Decree, in *Hadix.*

While in their motion to modify the Out–of–Cell Activity Plan mandated by the Consent Decree in *Hadix,* defendants rely on *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), defendants in *Glover* apply the *Rufo* principles in seeking modification of the Remedial Plan. Before discussing and deciding the respective motions filed in these two cases, it is important to point out the lengthy and arduous work which these cases have required in order to secure compliance with the Consent Decree and the Out–of–Cell Activity Plan in *Hadix,* and the negotiated settlement and Remedial Plan in *Glover.* Even now, after years of attempted compliance, the parties are at odds as to whether the goals have been achieved.

It may be indigenous to the nature of this litigation that it is seemingly endless. For example, with the exception of Michael Barnhart, counsel now for both plaintiff classes, all of the numerous attorneys who have represented the plaintiff class or have been on the staff of the Attorney General are no longer in the cases. The office of Director of the Department of Corrections has had a number of individuals, beginning with Perry Johnson, and now Kenneth McGinnis. The population of the prisons is under constant change and, thus, the inmates who arrive at the prison facilities and are represented in both class actions are unacquainted with the past history of these cases, and see their confinement problems as new matters. Finality in these cases is, accordingly, elusive— even though it is highly desired.

What is striking, too, is the argument that is now marshalled in favor of modification. Curiously, defendant Department of Correc-

tions has argued that public opinion with regard to the "rights" of prisoners has changed.

This court is necessarily concerned with the status of compliance with the various orders, plans, the negotiated settlement and Consent Decree mandates, should this court's involvement be terminated.

These are matters that are at the nerve center of these motions seeking modifications and termination; and they must be dealt with, if possible, in each of the respective opinions and decisions.

In this case, defendants seek, pursuant to Fed.R.Civ.P. 60(b)(5), or alternatively Fed. R.Civ.P. 60(b)(6), an order modifying the compliance monitor and the termination language contained in the Remedial Plan and in the Plan for Vocational Programs and Work Pass.[1]

## II. BACKGROUND

This civil rights action was originally filed on May 19, 1977, pursuant to 42 U.S.C.A. § 1983, by a class of female inmates housed at the State of Michigan's Huron Valley Women's Facility. Plaintiffs alleged that they were not provided educational, vocational and employment programs comparable to those offered to male inmates in violation of the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution. After a hearing on the merits, I issued an order finding defendants in violation of the Equal Protection Clause as to educational,

apprenticeship, and vocational programming. *Glover v. Johnson,* 478 F.Supp. 1075 (E.D.Mich.1979). I also found that plaintiffs had been denied adequate access to the courts in violation of the Constitution. *Id.* These orders were affirmed in *Glover v. Johnson,* 934 F.2d 703 (6th Cir.1991).

On September 14, 1989, due to defendants' repeated failure to provide female inmates with educational and vocational opportunities comparable to those provided to male inmates in the previous ten years,[2] I filed an Opinion and Order, which required that a special administrator be appointed to design and implement a remedy for these violations (the "Remedial Plan" or the "Plan"). *Glover, et al. v. Johnson, et al.,* 721 F.Supp. 808, 851 (E.D.Mich.1989). The purpose of the Remedial Plan is to remedy the constitutional violations found by the court in its 1989 order. It encompasses the issues of post-secondary education, apprenticeships, and access to courts. A separate document entitled "A Plan for Vocational Programs and Work Pass" was also submitted.[3]

## III. DEFENDANTS' MOTION TO AMEND OR MODIFY THE COMPLIANCE MONITOR AND TERMINATION LANGUAGE IN THE REMEDIAL PLAN AND THE PLAN FOR VOCATIONAL PROGRAMS AND WORK PASS

As currently written the Remedial Plan and the Plan for Vocational Programs and

---

1. Lengthy hearings were held on defendants' motion on May 24, June 2, June 17, June 27, August 16, September 19, and November 14, 1994. At the conclusion of the hearings, at the request of the court, the parties filed detailed Proposed Findings of Fact and Conclusions of Law.

   The court's Monitor, Dr. Rosemary Sarri, was present at each of the hearings and filed, at the court's request, her comments with regard to the current status of the programs referred to in the Remedial Plan and the Plan for Vocational Programs and Work Pass. Dr. Sarri's comments, however, are not evidence in the case; they are her response to the evidence presented. Both parties were permitted to respond to Dr. Sarri's comments. Defendants, in their response to Dr. Sarri's comments, submitted a lengthy affidavit of Nancy Zang, Special Administrator for Female Offender Programs, Michigan Department of Corrections. The Zang Affidavit is not admitted as evidence and was not considered in writing this opinion.

2. In 1991 the Court of Appeals for the Sixth Circuit characterized defendants' conduct as follows:

   The history of this case shows a consistent and persistent pattern of obfuscation, hyper-technical objection, delay and litigation by exhaustion on the part of the defendants to avoid compliance with the district court's orders. The plaintiff class has struggled for eleven years to achieve the simple objectives of equal protection under the law....
   *Glover v. Johnson,* 934 F.2d 703 (6th Cir.1991).

3. From the date of the filing of the Remedial Plan and the Plan for Vocational Programs and Work Pass (collectively referred to as the "Plans") until August 25, 1994, at least nine Orders have been entered to compel compliance with this court's Orders and the Plans.

Work Pass (collectively referred to as the "Plans") require two years of formal monitoring and reporting responsibilities after formal court approval. The Remedial Plan's provisions on implementation, the compliance monitor and termination provide as follows:

*Implementation*

Defendants shall implement this remedial plan in accordance with its terms on or before two (2) years from the date of its approval by the Court.

*Compliance Monitor*

Defendants shall monitor the binding provisions of the Remedial Plan [and] shall file with the Court and serve upon the Court Monitor and Plaintiffs' counsel quarterly monitor reports until the filing of the final monitor report ... The monitor reports shall include the compliance status and the progress of each binding provision set forth in this remedial plan.

Within one hundred and twenty (120) days of the expiration of the two (2) year implementation period, Defendants shall file with the Court and serve upon the Court Monitor and Plaintiffs' counsel a final monitor report describing the compliance status of each binding provision ... After filing of the final report, monitoring of the remedial plan shall terminate.

*Termination*

Defendants shall be in substantial compliance where 75% or more of the binding provisions in each program area set forth in this remedial plan are found in compliance in the final monitor report. Where the final monitor report reflects substantial compliance with the binding provisions in one or more program areas, the jurisdiction of the Court shall be terminated for each of the compliant areas thirty (30) days from the filing of the final monitor report, unless Plaintiffs file a Motion requesting extension of the Court's jurisdiction due to existence of constitutional viola-tions with the program areas set forth in this remedial plan.

The Plan for Vocational Programs and Work Pass contains similar language.

Defendants move to completely delete the compliance monitor, in each plan, and to modify the termination language as follows:

***TERMINATION***

Federal court approval of the Remedial [Vocational and Work Pass] Plan, or any portion of the Remedial [Vocational and Work Pass] Plan, establishes that all remedial obligations relative to the approved portions (i.e., legal access, educational programming and apprenticeships) which resulted from the findings of constitutional violations, have been satisfied and that the federal court's jurisdiction in the approved area(s) is terminated. Upon approval of the Remedial [Vocational and Work Pass] Plan, or any portion thereof, an order will immediately be entered terminating the court's jurisdiction over the applicable provision(s).

In considering defendants' motion to modify the compliance monitor and termination language of the Plans, what must be borne in mind is that defendants' motion, in reality, seeks to terminate the Plans and to end the role of the Court Monitor. Thus, defendants seek to terminate the case itself.[4] Defendants believe that implementation and monitoring of the Plans have been ongoing; therefore, there is no need for a compliance monitor, and no need to monitor defendants' conduct. Defendants believe the monitoring and reporting requirements outlined in the current Plans, in addition to what defendants have already been subject to during the pendency of approval of the Plans, substantially burden them. They argue that the motion should be granted because they have "substantially complied" with this court's previous orders and with the Remedial Plan and the

---

**4.** Although the court realizes defendants want complete termination, this Opinion and Order addresses only the areas in the Remedial Plan and the Plan for Vocational Programs and Work Pass with which defendants allege they are in compliance. There are other orders and issues, not addressed by this Opinion, such as the position of vocational coordinator, (Order of March 29, 1993 Regarding Vocational Coordinator), the continued provision of on-site legal services, (Interim Order for Programming of Aug. 12, 1991), and the provision of legal assistance in the area of parental rights, (Opinion and Order of April 29, 1994, 850 F.Supp. 592; Order of May 6, 1994), which must be addressed before this case can be completely terminated.

Plan for Vocational Programs and Work Pass.[5]

## IV. ANALYSIS

Federal Rule of Civil Procedure 60(b)(5) provides that a party may obtain relief from a court order when "it is no longer equitable that the judgment should have prospective application." Fed.R.Civ.P. 60(b)(6) provides that a party may obtain relief from a court order for "any other reason justifying relief from the operation of judgment."

Defendants recognize that neither of the Plans are consent decrees but argue that modification under the test provided by the Supreme Court in *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), is appropriate due to the changed legal and factual circumstances stated above. In *Rufo*, the Supreme Court adopted a test for district courts to utilize when considering requests to modify, pursuant to Fed.R.Civ.P. 60(b), consent decrees stemming from institutional reform litigation. *Rufo* requires that defendants demonstrate a significant change in either factual conditions or in the law which makes compliance with the decree substantially more onerous. *Id.* at 384, 112 S.Ct. at 760. Alternatively, defendants may show that the decree is unworkable because of unforeseen obstacles or that enforcement of the Decree without modification would be detrimental to the public interest. *Id.*

Defendants argue that the court's active participation in the implementation and monitoring of defendants' compliance with the Plans constitutes changed factual circumstances which make compliance with the Plans more burdensome.[6] Additionally, de-

fendants assert that they did not anticipate that the following acts would take place prior to approval of the Plans: (1) that the court would give permission to implement the Plans while indefinitely delaying approval; (2) that they would be required to submit status reports and respond to numerous inquiries from plaintiffs' counsel; and (3) that the court would become involved in the implementation and monitoring of the Plans.

Defendants argue that the modified language, *supra*, responds to the changed circumstances of delayed court approval, defendants' work over the past two and a half years to implement the Plans and the court's encouragement of monitoring by plaintiffs' counsel, the Court Monitor, and the court itself. According to defendants, the modification also alleviates defendants and the court from the substantially more onerous task of continuing compliance monitoring two years beyond the date the court finally approves the Plans.

## V. COMPLIANCE WITH THE PLANS

■ Fed.R.Civ.Pro. 60(b) is applicable only to final judgments and orders; defendants' proposed Remedial Plan and Plan for Vocational Programs and Work Pass are neither. *Rufo*, *supra*, involved the application of Rule 60(b) to a remedial institutional consent decree; the Plans are not consent decrees. Therefore the factual context is distinguishable. In an attempt to evaluate defendants' motion, I adopted a substitute approach; assuming that the Plans had been de facto approved, I sought to determine if defendants are currently in compliance with the Plans.[7] If defendants are currently in substantial compliance with the Plans, the *Rufo*

5. In their brief and during the hearings on the motion, defendants focused on the Remedial Plan and the Plan for Vocational Programs and Work Pass which refer to access to the courts, paralegal trainee pay, law libraries and paralegal training, educational programming, which includes the related sub-programs of associate degree programming and baccalaureate degree programming, apprenticeships, and vocational programs and work pass.

6. Defendants' motion at paragraph 12, states:
   The Court's active participation in monitoring the implementation of the Remedial Plan and

   the Plan for Vocational Programs and Work Pass, Defendants' work over almost the past two years to implement the plans, and, the Court's encouragement of the monitoring by both Plaintiffs' counsel and the court monitor are significantly changed circumstances which indicate that deleting the compliance monitor language in each plan and modifying the termination language is necessary.

7. The Remedial Plan speaks of seventy-five percent (75%) compliance. I find that, for purposes of compliance, 75% compliance or substantial compliance are synonymous terms.

analysis can be applied to the motion for modification and a determination can be made whether the changed factual circumstances advanced by defendants warrant modification of the compliance monitor and termination language of the Remedial Plan and Plan for Vocational Programs and Work Pass.

■ For the following reasons, I conclude that defendants are not in substantial compliance with the Plans.[8] Defendants' motion to terminate the court's jurisdiction in this case by way of deleting the role of the compliance monitor and modifying the termination language of the Plans is denied.

### A. Access to Courts

#### 1. Requirements under the Remedial Plan and/or previous orders.

Defendants must provide paralegal training at all facilities and camps housing members of the plaintiff class. (Opinion and Order of Jan. 14, 1994; Interim Order for Programming of Aug. 12, 1991; Remedial Plan at 2–4.) Paralegal training must be provided to interested and qualified inmates until an adequate pool of writ-writers and trained legal assistants is developed, (Remedial Plan at 2–4; *Glover v. Johnson,* 721 F.Supp. 808, 814 (E.D.Mich.1989)), and law libraries at all female facilities must be developed and maintained in accordance with the standard established in *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (*Id.*). Defendants must pay all paralegal trainees $1.50 a day. (Remedial Plan at 2–4.)

#### 2. Defendants' current compliance.

Although defendants have made significant improvements,[9] a number of deficiencies remain. For example, no method has been developed to determine whether there exists an adequate pool of writ-writers in the prisons. Additionally, information is still lacking about the adequacy of writ-writers and their utilization. There are law libraries available at the Crane (located at Evergreen School), Scott and Camp Branch facilities, but there is no library currently at Camp Gilman nor a paralegal.[10]

### B. Educational Programming

#### 1. Requirements under the Remedial Plan and/or previous orders.

Defendants were ordered to assist and cooperate in the establishment of a four-year college degree program that any educational institution chose to offer for plaintiff class members housed at the Crane Main, Crane Annex and the Scott facilities. (Interim Order for Programming Aug. 12, 1991; Remedial Plan at 3–3.) The programs were to begin with no less than seven (7) courses offered in two degree areas. Defendants were also ordered to provide two-year college degree programming which, "when successfully completed culminates in the receipt of an Associate Degree" at all facilities housing plaintiff class members and offer a minimum of nine (9) courses. *Id.* Finally, defendants were ordered to provide the opportunity to participate in two- and four-year degree programming to plaintiff class members housed at the camp facilities.[11] *Id.*

Defendants must also maintain educational files which include Individual Program Plans ("IPP's") for all women enrolling in associate degree programs, baccalaureate degree programs and vocational programs. (Remedial Plan at 3–2.)

---

**8.** *See supra* note 5 for the areas of the Plans addressed by this Opinion.

**9.** Paralegal classes are being offered at both the Crane and Scott facilities, and women from the camps are permitted to request transfers back to the prisons if they wish to have paralegal training. Defendants have implemented a paralegal trainee pay scale of $1.50 per day five days a week as required.

**10.** Defendants have now notified the court that Camp Gilman is to be closed. As this Opinion was about to filed, a response by the plaintiff class to the closing of Camp Gilman was filed. This matter will be left to another day.

**11.** Under the order, plaintiffs who choose to participate in college programs must be transferred to the Crane or Scott facilities and upon completion or ending college programs, shall, if eligible, have priority in returning to the camp. (Interim Order for Programming of Aug. 12, 1991 at 2.)

## 2. Defendants' current compliance.

Significant progress has been made in the provision of college programming at both the associate and baccalaureate degree levels. As of June 1994 over two hundred women at Crane and one hundred eighty-two women at Scott were enrolled in college programming. (Test. of Nancy Zang, June 17, 1994.) The college curricula has improved with a broader range of courses being offered in meaningful occupational areas for women prisoners. Women at the camps who request transfers are being allowed to enroll in college courses, and some have made such requests.

However, there still are women in college programming who do not have IPP's prepared. Additionally, there are a number of women who are prevented from taking a full twelve-credit course load because of space problems.[12]

## C. Apprenticeships

### 1. Requirements under the Remedial Plan and/or previous orders.

Five apprenticeship programs (medical records, building maintenance, dental assistants, painting and carpentry) were to be put in place and operational at the Huron Valley Women's Facility ("HVWF"). (Remedial Plan at 4–2.) Defendants were required to add additional apprenticeships, (*Id.*), by determining apprenticeship program viability for the Crane and Scott facilities and choosing apprenticeship programs accordingly. (*Id.* at 4–5.) Defendants were to seek court approval prior to implementing additional apprenticeships. (*Id.*) The programs installed by defendants were required to be taught through either of three classic methods of education: (1) classroom instruction; (2) community college; or (3) lectures. (Opinion and Order of June 16, 1993.) Defendants were also required to recruit and select inmates for apprenticeships and to develop a monitoring plan to ensure that meaningful apprenticeships were provided. (Remedial Plan at 4–5.) Mere posting of apprenticeship openings was held to be insufficient; defen-

dants were required to assist in motivating inmates to apply for apprenticeship openings. (Opinion and Order of June 16, 1993.)

## 2. Defendants' current compliance.

An evaluation and determination of program viability was performed to determine which apprenticeship programs were best for members of the plaintiff class. Currently, there are five apprenticeships at Crane: peripheral equipment operator, institutional cook, maintenance electrician, landscape gardener, and building maintenance. There are six apprenticeships at Scott: cook, dental, electrical, landscape gardener, building maintenance and repair, and painter.

Defendants argue they have not been able to fill three of the five Crane apprenticeships due to eligibility requirements. Current eligibility requirements have excluded nearly one hundred women from participation in apprenticeship programming. (Pls.' Exh. 3.) The gate pass and the TABE [13] requirements at Crane have prevented almost all of the interested women from enrolling in apprenticeships currently offered. Defendants are clearly not in substantial compliance with the goals of apprenticeship programming as established in the Remedial Plan. Under the Plan, defendants are required to recruit and motivate women to participate in apprenticeship programming. Although some selection process is required, defendants' eligibility criteria may discourage women from even applying for apprenticeships, and thereby contradict the purpose of having such programming.

## D. Vocational Programming

### 1. Requirements under the Plan for Vocational Programming and Work Pass/previous orders.

Under the Plan, defendants were to begin a vocational counseling and testing program which was to be followed by a survey of women's vocational interests. The programs which have significant interest and are suitable to the prison environment were to be

---

12. According to defendants, the space problem will be alleviated by the opening of the Evergreen School.

13. Test for Adult Basic Education.

implemented. I ordered defendants to provide vocational programs at all facilities housing members of the plaintiff class. (Interim Order for Programming of Aug. 12, 1991.) The programs were to include, but not be limited to: graphic arts, office occupations and food service. (*Id.*)

### 2. *Defendants' current compliance.*

Defendants have developed the dental lab program at Scott and a career vocational plan has been developed. Additionally, there are court-ordered programs at Crane and Scott in office occupations, graphic arts and food service; there are three other non-court ordered programs at Scott: institutional maintenance, auto mechanics and building trades. Horticulture is the fourth program at Crane. Vocational offerings recommended by Dr. Merry Morash [14] in business/office skills and computers have increased, but there still are no vocational offerings in health care and human services which are very high occupational demand areas for women upon release from prison. As of May 1993, 108 women were enrolled in six different vocational classes at Scott. (Pls.' Exh. 1.) At Crane eighty-three women were enrolled in five classes (*Id.*). However, as of June 1, 1994, there were eligible inmates who were not enrolled in vocational programming due to waiting lists. (Test. of Nancy Zang June 2, 1994.) Additionally there are a significant number of women in camps who are not receiving vocational programming although their earliest release dates are more than a year away.

### E. *Work Pass*

#### 1. *Requirements under the Plan for Vocational Programming and Work Pass/previous orders.*

In 1979 I held that women inmates were entitled to participate in a work pass program [15] as was available to male inmates. Defendants were required to provide work pass programming at all facilities and camps housing members of the plaintiff class. (Plan for Vocational Programs and Work Pass at 6.) Defendants were also required to provide public works programming. [16]

### 2. *Defendants' current compliance.*

There are currently no women being taken out on work pass although there is a provision, for such assignments, in the Plan for Vocational Programming and Work Pass. There has been a continued decrease in the number of women going out on community residential placement; this program was structured to take the place of work pass. Although work pass is still a potential alternative for women who meet the criteria, such programming is significantly reduced because of more stringent security requirements. Defendants have not proposed alternative programming to work pass despite the fact that women are spending longer periods of time in the camps and inmates in the camps are being denied the opportunity to transfer back to the main prisons to take advantage of vocational programming.

There are public works opportunities at both the Gilman [17] and Branch camps with the latter having far more inmates enrolled. [18] According to defendants, all of the women at Camp Branch who are eligible for public works are being allowed to participate in public works. The current prisoner idleness percentage at Camp Branch is zero.

## VI. CONCLUSION

Although defendants have made significant improvements in a number of areas of the

---

14. Dr. Morash served as a consultant to defendant Michigan Department of Corrections and is the Chair of the Criminal Justice Department at Michigan State University. She performed a Vocational Program Analysis as consultant to defendant.

15. The work pass program enables inmates to work unsupervised, in the community for a private employer.

16. Public works assignments enable inmates having a Level I or Level II security classification to leave the institution daily on work crews comprised of other female offenders. All public works assignments are supervised by defendant Department of Corrections.

17. *See supra* note 10.

18. Eighty enrollees at Branch with many additional community requests that could be filled.

Remedial Plan and the Plan for Vocational Programs and Work Pass, they have not substantially complied with either of the Plans as a whole. Defendants' Motion to Amend or Modify the Compliance Monitor and Termination Language in the Remedial Plan and the Plan for Vocational Programs and Work Pass is denied.

## VII. *FINALITY IN THESE PROCEEDINGS*

As has been indicated, both *Hadix v. Johnson* and *Glover v. Johnson* have been before this court for many years. Defendant Department of Corrections has frequently raised the question of finality in these proceedings. There must come a time when the involvement of the court is no longer either required or necessary. The plaintiff class in each case argues that until the conditions that brought these cases to this federal court initially have been corrected, there is no basis for the contention of finality.

Nonetheless the matter of finality must be addressed. Where, as in these cases, the parties (inmates versus Department of Corrections) are in a continuing relationship, the concept of finality becomes even more complicated.

For example, it would be an exercise in futility for me to hold that finality has been attained, only to have a group of plaintiff inmates begin a new case, citing the allegations of constitutional violations. The perplexing issue is: **How is finality reached in these public agency-public law cases?** Arguably, permanent involvement by a federal court in the work of a state agency such as the Department of Corrections is not desirable and, at some point, unwarranted.

As it is so often a need in the administration of justice, a balance must be reached. That balance is reached, it seems, when there is substantial compliance with the goals of either a consent judgment, as in *Hadix*, or a negotiated settlement, as in *Glover*. As the analysis of these factors has been made in each of these cases, as indicat-

ed in the foregoing Opinion, that requirement of compliance has not yet completely been reached. That fact may not be used, however, to avoid addressing finality. Even though progress has been slow in both cases, there has been substantial progress toward finality.

It is this court's view that a further test period is still required. That test period can be measured in a discrete time frame.[19]

This court, with the aid of its Monitors, will determine within a period of sixty (60) days after December 31, 1996, whether compliance has been substantially accomplished. During the period prior to December 31, 1996, each of the monitors will perform quarterly reviews which will be submitted to the court and the parties detailing the compliance status in each program in each case. In making this judgment and adopting this approach, I have followed the teaching of *U.S. v. State of Mich.*, 18 F.3d 348 (6th Cir.1994). The procedure for the determination of finality, as outlined in that case, is a method for reaching a balance in these cases.

The plaintiff class may submit a proposed order.

---

19. This approach has already been endorsed by Defendant Director McGinnis. (Letter from Director McGinnis to the court of 2/15/95.)