**Mary GLOVER, et al., Plaintiffs,**

v.

**Perry JOHNSON, et al., Defendants.**

No. 77–CV–71229.

United States District Court,
E.D. Michigan,
Southern Division.

July 19, 1996.

---

Deborah LaBelle, Detroit, MI, for Plaintiffs.

Lisa Ward, Asst. Attorney General, Mich. Dept. of Corrections, Lansing, MI, for Defendants.

## OPINION AND ORDERS REGARDING PLAINTIFFS' MOTIONS TO COMPEL AND FOR CONTEMPT SANCTIONS

FEIKENS, District Judge.

This protracted prisoner class action commenced in 1977. To provide a context for my decisions today, I will sketch a brief history of the case. For those persons interested in a more detailed presentation, the history provided in *Glover v. Johnson*, 721 F.Supp. 808

(E.D.Mich.1989), and *Glover v. Johnson*, 934 F.2d 703 (6th Cir.1991), should suffice.[1]

In a 1979 opinion, I found that the educational and vocational opportunities available to female prisoners in the custody of the Michigan Department of Corrections ("Department of Corrections" or "Department") were substantially inferior to those provided male prisoners. *Glover v. Johnson*, 478 F.Supp. 1075 (E.D.Mich.1979) (*"Glover I "*). On April 6, 1981, after comprehensive negotiations, I entered a Final Order setting forth the remedies to be provided by the Department. *Glover v. Johnson*, 510 F.Supp. 1019 (E.D.Mich.1981) (*"Glover II "*). Neither of these orders was appealed and therefore they serve as the law of the case. *Glover*, 934 F.2d at 706.

From 1981 to 1986, the Department proved unwilling to implement some of the programs ordered in *Glover I* and *Glover II*, even after findings of contempt and threats of further contempt. In 1991, I tried another approach; I ordered Defendants to develop a remedial plan to address the constitutional problems in its women prisons.[2] Defendants appealed this order but the United States Court of Appeals for the Sixth Circuit agreed with me that the Department had not used its best efforts to comply with *Glover I* and *Glover II*. *Glover*, 934 F.2d at 714. In fact, the court of appeals stated that "[t]he history of this case shows a consistent and persistent pattern of obfuscation, hyper-technical objections, delay, and litigation by exhaustion on the part of the defendants to avoid compliance with the letter and the spirit of the district court's orders." *Id.* at 715.

From 1991 to 1995, Defendants did not comply with their own remedial plan in significant ways. Intent on ending this time-consuming and costly litigation, I tried a

---

1. In all there have been thirteen previously published opinions in this case: *Glover v. Johnson*, 85 F.R.D. 1 (E.D.Mich.1977); *Glover v. Johnson*, 478 F.Supp. 1075 (E.D.Mich.1979); *Glover v. Johnson*, 510 F.Supp. 1019 (E.D.Mich.1981); *Glover v. Johnson*, 531 F.Supp. 1036 (E.D.Mich. 1982); *Glover v. Johnson*, 659 F.Supp. 621 (E.D.Mich.1987); *Glover v. Johnson*, 662 F.Supp. 820 (E.D.Mich.1987); *Glover v. Johnson*, 855 F.2d 277 (6th Cir.1988); *Glover v. Johnson*, 721 F.Supp. 808 (E.D.Mich.1989); *Glover v. Johnson*, 934 F.2d 703 (6th Cir.1991); *Glover v. Johnson*, 850 F.Supp. 592 (E.D.Mich.1994); *Glover v.*

*Johnson*, 862 F.Supp. 180 (E.D.Mich.1994); 879 F.Supp. 752 (E.D.Mich.1995); and *Glover v. Johnson*, 75 F.3d 264 (6th Cir.1996).

2. Contrary to assertions in the Congressional Record, I have found Michigan's prison system to violate the Constitution on innumerable occasions. For senatorial comments, see 142 Cong. Rec. S3703–04 (daily ed. Apr. 19, 1996). For my findings of constitutional violations, see, for example, *Glover*, 478 F.Supp. at 1101.

third approach to resolve this dispute. In a July 25, 1995 order, I established a "compliance committee" to address the problems preventing compliance with the remedial plan. The Compliance Committee included representatives from the parties and the court but no lawyers; it was my hope that a nonadversarial approach to the conflict might render more satisfying results. However, the Compliance Committee format met with substantial resistance. Defendants appealed every one of my orders seeking to establish or sustain it. Department of Corrections Director Kenneth McGinnis declined to meet with me to discuss how the Compliance Committee might be structured or utilized to meet the common goal of finality in these proceedings. Without hope that this nonadversarial approach could succeed, I dissolved the Compliance Committee in a January 5, 1996 order.

In July 1995, Plaintiffs had filed three motions alleging problems that I had hoped would be resolved by the Compliance Committee. In these motions Plaintiffs sought relief for alleged violations of the remedial plan and other associated orders regarding prisoner access to the courts, denial of programming based on prisoner custody level, and denial of program opportunities at Camp Branch. When the Compliance Committee effort failed, I scheduled hearings on these motions. On January 19, 1996, Plaintiffs filed a fourth motion alleging violations of court orders as to apprenticeship programming at the Crane Women's Facility.

On February 15, 1996, February 16, 1996, March 11, 1996, and March 15, 1996, evidentiary hearings were held on Plaintiffs' motions. On May 7, 1996, and May 9, 1996, the parties argued their proposed findings of fact and conclusions of law on the four motions. This opinion and its orders address the issues raised in these four motions.

## I. Contempt Proceedings

■ Because Plaintiffs seek contempt sanctions, it is important to state the law of contempt proceedings. The basis of all such

proceedings is "the basic proposition that all orders and judgments of courts must be complied with promptly." *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 590 (6th Cir. 1987). In a civil contempt proceeding, a plaintiff must prove by clear and convincing evidence that the defendant did not comply with a court's prior order. *Glover v. Johnson*, 75 F.3d 264, 266 (6th Cir.1996), *petition for cert. filed*, 64 U.S.L.W. 3823 (May 30, 1996). The test for compliance is not whether a defendant made a good faith effort at compliance but whether the defendant took all reasonable steps to obey the court's order. *Glover v. Johnson*, 934 F.2d at 708. Once a prima facie showing of a violation of the court's order has been made, the charged party has the burden of proving inability to comply. *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir.1995). "The alleged contemnor's burden is to establish his inability clearly, plainly and unmistakably." *Id.* The burden of production regarding inability "may be difficult to meet, particularly in cases ... where the defendants have a long history of delay and the plaintiffs' needs are urgent." *Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir.1986), *cert. denied*, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987). (Citations omitted).

## II. Plaintiffs' Motion to Compel Law Library Access and Implementation of Inmate Assistance Agreements at Scott Correctional Facility

■ The Constitution guarantees effective and meaningful access to the courts for prisoners. *Lewis v. Casey*, ── U.S. ──, ──── ──────, 116 S.Ct. 2174, 2180–81, 135 L.Ed.2d 606; *Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494–95, 52 L.Ed.2d 72 (1977). Having concluded that Defendants have violated this constitutional right on several occasions, I have issued assorted remedial orders requiring Defendants to provide Plaintiffs adequate access. *See, e.g., Glover*, 510 F.Supp. at 1023; *Glover*, 721 F.Supp. 808, 814–15 (E.D.Mich.1989).

Recently, my orders regarding access have been embodied in the remedial plan.[3] It

---

3. It is significant, in light of the Supreme Court's decision in *Lewis*, that the remedial plan was

developed and written by the Defendants. In *Lewis*, the Supreme Court ruled that adequate

provides, in conjunction with Department of Corrections Policy Directive ("PD") BCF–61.01, that all general population prisoners shall be entitled to use the main law library at each correctional facility for a least six hours each week. RP 2–3; PD–BCF–61.01 at 4. It also requires Defendants to provide paralegal training "until such time as a sufficient pool of trained legal assistants is developed." RP 2–4. Finally, the Defendants are required to establish a method to determine when a sufficient pool of inmate paralegals exists to meet the needs of the prisoner population. RP 2–6.

From December 1991, when the remedial plan was implemented, until January 1995, when Defendants established its new segregation policy, general population prisoners of every custody classification were provided use of the main law library at Scott Correctional Facility ("SCF"). There has been no ambiguity in the Court's order that all plaintiff class members were entitled to access to a *Bounds* law library. That this has been the understanding of Defendants is evidenced by the fact that in the remedial plan Defendants acknowledged that they had already remedied their procedures to allow level I prisoners, housed outside the main complex at SCF, regular access to the main law library. Finally, Prisoners were also able to establish a legal assistance agreement with a trained prisoner paralegal, irrespective of custody level.

Plaintiffs contend that in contravention of this Court's orders, Defendants have denied prisoners assigned to custody levels I, IV, and V at SCF adequate access to the courts. Defendants counter that the limits they have placed upon prisoner access to the main law library and legal assistance are justified by legitimate security concerns. Moreover, Defendants contend that the access still available to level I, IV and V prisoners satisfies the requirements of the orders of this Court

and the Constitution. Finally, Defendants argue that Plaintiffs lack standing to pursue this motion. I conclude that Defendants' contentions are largely without merit and that prisoner access to the courts at SCF violates the clear orders of this Court and is also constitutionally inadequate.

### A. *Findings of Fact*

Based upon the evidence presented during the evidentiary hearings, and pursuant to Federal Rule of Civil Procedure 52(a), I make the following findings of fact in regard to Plaintiffs' Motion to Compel Law Library Access and Implementation of Inmate Assistance Agreements:

### 1. *Defendants' Segregation Policy*

(1) In January 1995, as a consequence to an escape from the Ryan Correctional Facility, Defendants implemented Policy Directive 05.01.140, which requires the segregation of prisoners by custody level.[4] Tr. 1/23/96 at 29.

(2) PD 05.01.140 provided for exceptions to the requirement of segregation for academic or vocational training, the Warden's Forum, the Prisoner Benefit Fund, and Store Committee. Defs. Ex. 5.

(3) Defendants' segregation policy was modified by the Department of Corrections to permit prisoners of different security levels to attend sex offender and assaultive offender psychotherapy groups and outpatient mental health team group therapy. Defs. Ex. 5 (DOM 1995–54).

(4) The warden of SCF sought and received variances from PD 05.01.140 for Women's Legal Services and prison industries. Tr. 1/23/96 at 35–36.

(5) The warden for SCF never sought a variance to allow level I or level V prisoners to use the law library with other custody levels. Tr. 1/23/96 at 36.

---

consideration must be given to the views of state prison authorities when a District Court seeks to correct errors in the internal administration of a prison. *See Lewis*, —— U.S. at ——, 116 S.Ct. at 2185.

**4.** Paragraph ZZ of PD 05.01.140 provided:

In multi-level facilities, prisoners shall only be allowed to have contact with prisoners of different security levels while participating in the areas of academic or vocational training, the Warden's Forum, the Prisoner Benefit Fund or the Store Committee. Prisoners of different security levels shall be kept separate for all other purposes.

(6) Defendants' segregation policy does not require the exclusion of any custody level from use of libraries. Defs. Ex. 5 (PD 05.01.140 and DOM 1995–54).

(7) In January, 1996, SCF was provided a blanket exemption from PD 05.01.140 which applies whenever the warden determines that mixing of custody levels is necessary to the provision of services and functions. Tr. 1/23/96 at 36–37; Pls. Ex. 1; Defs. Ex. 5 (DOM 1996–51).

### 2. *Library Access*

(8) The main law library at SCF is the only law library at SCF which meets the minimum requirements of *Bounds* as required in the remedial plan. Tr. 1/23/96 at 77, 80; Defs. Ex. 4.

(9) When the remedial plan was implemented in 1991, all prisoners were provided access to the main law library at SCF. RP 2–3.

(10) The mini-law libraries utilized by Defendants include only the minimum collection required for segregation unit law libraries. Tr. 1/23/96 at 80; Tr. 2/15/96 at 149.

### 3. *Level I Prisoner Access*

(11) Level I prisoners, who are housed in the Franklin Unit outside the main complex at SCF, are no longer permitted physical access to the main law library at SCF. Tr. 1/23/96 at 28.

(12) In lieu of access to the main law library, Defendants have installed a mini-law library in the Franklin (level I prisoners) and Essex (level V prisoners) Units. Tr. 1/23/96 at 88, 145.

(13) Level I prisoners are allegedly denied access to the law library because they could introduce contraband into SCF or serve as unwitting mules. Tr. 1/23/96 at 27; Tr. 2/15/96 at 63.

(14) Level I prisoners are not problematic prisoners and are trusted prisoners. Tr. 1/23/96 at 26.

(15) The warden at SCF could not recall a single instance where a level I prisoner had introduced contraband while in the main law library. Tr. 1/23/96 at 28, 32.

(16) The warden at SCF could not recall a single instance where there was a security problem due to the mixing of level I prisoners with other custody levels in any context (college classes, vocational programming, prison store, Prisoner Benefit Fund, Women's Legal Services, or prison industries). Tr. 1/23/96 at 38.

(17) Defendants continue to exclude level I prisoners after receiving a blanket variance from the segregation policy. Tr. 1/23/96 at 38.

### 4. *Level V Prisoner Access*

(18) Level V prisoners are general population (not segregation) prisoners. Tr. 1/23/96 at 82; Tr. 2/15/96 at 149.

(19) Level V prisoners, who are housed in the Essex Unit, are no longer permitted physical access to the main law library at SCF. Tr. 1/23/96 at 85.

(20) Level V prisoners who requested access to the main law library were denied. Tr. 1/23/96 at 104–05.

(21) Defendants' policy regarding prisoner access to law libraries requires all general population prisoners to have access to the main law library at correctional facilities. Defs. Ex. 4 (PD 05.03.115); Tr. 2/15/96 at 78.

(22) Level V general population male prisoners are not denied access to a full library or limited to a segregation unit law library. Tr. 2/15/96 at 150.

(23) In lieu of access to the main law library, Defendants have installed a mini-law library in the Essex Unit. Tr. 1/23/96 at 105.

(24) The mini-law library in Essex is located in a nine-by-nine-foot cell. Tr. 1/23/96 at 90.

(25) Level V prisoners can only use the Essex mini-law library for one hour intervals and there can only be two prisoners in this library at any one time. Tr. 1/23/96 at 90.

(26) The mini-law library in Essex does not contain Department policy directives and prisoners are charged for copies obtained from the main law library. Tr. 1/23/96 at 95, 104.

(27) The level V paralegal is denied physical access to the main law library. Tr. 1/23/96 at 60.

### 5. *Legal Assistance* [5]

(28) Level I and V prisoners can request legal assistance from the SCF law librarian via institutional mail. Tr. 1/23/96 at 53–58.

(29) Level I and V prisoners can borrow up to five books or other legal resources from the main law library at SCF via institutional mail. Such loans are limited to 24 hours. Tr. 1/23/96 at 62–63.

(30) Requests for books from the main law library must be specific. Tr. 1/23/96 at 85, 86.

(31) It takes as little as a day or two and as much as a week or more for a book to be delivered to a prisoner from the main law library. Tr. 1/23/96 at 103, 145.

(32) Level I and V prisoners can receive legal assistance from an inmate paralegal if a legal assistance agreement is approved by the prison administration.

(33) Prior to the implementation of PD 05.01.140, prisoners who were party to a legal assistance agreement could meet in the law library to work on their legal matters. Tr. 1/23/96 at 127.

(34) In February 1995, Defendants terminated all existing legal assistance agreements between prisoners of differing custody levels. Tr. 1/23/96 at 125.

(35) From February 1995 until October 1995, Defendants did not permit any cross-custody legal assistance agreements. Tr. 1/23/96 at 125–26; Tr. 2/15/96 at 143.

(36) After October 1995, Defendants permitted cross-custody legal assistance agreements to be conducted via institutional mail. Tr. 1/23/96 at 128.

(37) Legal assistance agreements conducted via institutional mail take approximately one week from the time a prisoner solicits advice to the time she receives a response. Tr. 1/23/96 at 130.

(38) There is no established procedure for inmates· in a cross-custody legal assistance agreement to send legal materials to one another. Tr. 1/23/96 at 129.

(39) Level I and level V paralegals do not have access to the main law library. Tr. 1/23/96 at 89, 147.

(40) Illiteracy presents serious barriers to legal assistance conducted via institutional mail. Tr. 1/23/96 at 136.

(41) Defendants have not developed a mechanism to determine if there is an adequate pool of paralegals. Tr. 2/15/96 at 154.

### 6. *Level IV Prisoner Access*

(42) Level IV prisoners are scheduled to have physical access to the main law library at SCF from 7:45 a.m. to 10:45 a.m., Monday through Sunday. Pls. Ex. 6; Tr. 2/15/96 at 108.

(43) Level IV prisoner work details, GED classes, vocational programming, and yard time occur Monday through Friday between 7:45 a.m. and 10:45 a.m. Tr. 1/23/96 at 114; Tr. 2/15/96 at 130, 135.

(44) College programming, which occurs between 7:45 a.m. and 10:45 a.m. on Saturdays, also conflicts. Tr. 1/23/96 at 117.

(45) Religious services occur between 7:45 a.m. and 10:45 a.m. on Sundays. Tr. 1/23/96 at 117.

(46) Level IV prisoners who have requested use of the main law library *at a time other than regularly scheduled hours* have been denied. Tr. 1/23/96 at 121.

(47) A level IV prisoner who needed to use the main law library more than her allotted six hours per week was accommodated. Tr. 1/23/96 at 240; Tr. 2/15/96 at 109, 131.

(48) Level IV prisoners are not permitted to borrow resources from the main law library. Tr. 1/23/96 at 122.

---

**5.** While Women's Legal Services also has a presence at SCF, Defendants have conceded that Women's Legal Services does not provide an adequate substitution for access to an adequate law library or adequate legal assistance. Tr. 2/15/96 at 212. Women's Legal Services has 3.5 staff attorneys for the population of women prisoners in Michigan (approximately 1,400 persons). One staff attorney is assigned full-time to SCF. *Id.*

(49) Plaintiffs must choose between rights to access to the main law library and remedial programming and work details. Tr. 1/23/96 at 114–15.

(50) A prisoner who has a job detail, or participates in GED programming, or participates in court ordered programming, and attends church will only be able to access the law library for three hours a week. Tr. 1/23/96 at 116–18.

### 7. *Miscellaneous Finding*

(51) As a consequence of Defendants' restrictions on access, prisoners have had pleadings, grievances, appeals, and rehearings dismissed for untimeliness. 1/23/96 at 96–97, 99, 103, 117, 128.

### B. *Conclusions of Law*

■ I find by clear and convincing evidence that Defendants have denied, in violation of the orders of this Court and the Constitution, level I, IV, and V prisoners at SCF meaningful and effective access to the courts. First and foremost for the purpose of this motion, Defendants do not deny that their denial of level I and level V prisoners access to a *Bounds* law library is contrary to the remedial plan. Defendants essentially admit to contempt and try to justify their actions by arguing that they had a legitimate penological interest for their actions and that they have provided adequate alternative means of access. However, the remedial plan was established to address constitutional violations by the Department in the women's prison system. Defendants cannot decide unilaterally that a provision of the remedial plan has been met or that it is no longer needed. Any such determination is the role of this Court. *See Cooper v. Aaron*, 358 U.S. 1, 16–20, 78 S.Ct. 1401, 1408–11, 3 L.Ed.2d 5 (1958); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).

If Defendants desire changes in the remedial plan, the proper course would be for them to move to modify it. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992); *see also*

*Glover*, 934 F.2d at 708–09. Defendants are certainly entitled to present evidence of their evolving needs, of alternative methods by which adequate access to the courts might be provided, and of changes in the law. *Id.* Yet Defendants made no such motion and submitted no such evidence. Hence, Defendants' actions regarding prisoner access can only be characterized as contemptuous.

■ I also find Defendants' justifications for their actions to lack merit. Defendants' claim that they have provided adequate alternative means of access for level I, IV and V prisoners is specious. In *Bounds*, the Supreme Court resolutely held that prisoners have a fundamental right of meaningful access to the courts. This holding was very recently affirmed by the Supreme Court in *Lewis*. *Lewis*, — U.S. at — – —, 116 S.Ct. at 2179–80. In evaluating the constitutional adequacy of prisoners' access to the courts, the Supreme Court has instructed trial courts to evaluate prisoner access "as a whole," stressing that "meaningful access to the courts is the touchstone." *Bounds*, 430 U.S. at 823, 832, 97 S.Ct. at 1495, 1500; *see also Lewis*, — U.S. at — – —, 116 S.Ct. at 2180–81. Defendants' contention that they are only required to provide either a law library or legal assistance is self-serving and a gross oversimplification.[6]

■ Prison officials are not required to provide both a law library and legal assistance if access to either a library or trained personnel is effective and meaningful. This has been the longstanding rule in the Sixth Circuit. In *Knop v. Johnson*, 977 F.2d 996 (6th Cir.1992), *cert. denied*, 507 U.S. 973, 113 S.Ct. 1415, 122 L.Ed.2d 786 (1993), the question presented was whether the State of Michigan had to hire attorneys to assist prisoners in the preparation of their law suits. In holding that the touchstone of access is not access to lawyers but access to courts, the court carefully reviewed *Bounds* and other relevant precedent. It noted that the Supreme Court specifically stated in *Bounds* that "a legal access program need not include

---

**6.** I note that Defendants made this same argument in 1979 and that I rejected it then as well.

*Glover*, 478 F.Supp. at 1096.

any particular element" and that prison authorities must simply provide access to courts that is "adequate, effective, and meaningful." *Bounds*, 430 U.S. at 822, 832, 97 S.Ct. at 1495, 1500. The court declared that "*Bounds* teaches that "[t]he requirement of meaningful access can be satisfied in various ways," and "state legislatures and prison administrators must be given 'wide discretion' to select appropriate solutions." *Knop*, 977 F.2d at 1004 (quoting *Murray v. Giarratano*, 492 U.S. 1, 14, 109 S.Ct. 2765, 2772–73, 106 L.Ed.2d 1 (1989) (concurring opinion of Kennedy, J.)).

In *Glover v. Johnson*, 75 F.3d 264 (6th Cir.1996), a case cited by Defendants in support of their either/or argument, the court of appeals again utilized the effective and meaningful standard. It stated that "[w]ith regard to female prisoners in this facility who are not illiterate, not unable to understand English, this furnishing of a sufficient library with an adequate staff satisfies *Bounds v. Smith* standards." *Glover*, 75 F.3d at 268. For illiterate prisoners, library access is obviously not effective and meaningful access to the courts.[7]

Access to the courts at SCF is not effective or meaningful for level I, IV, or V prisoners. Level I and V prisoners have access to the courts via a mini-law library housed in each of their units, librarian assistance, and legal assistance agreement with other inmates. The mini-law libraries do not meet the minimum requirements of a *Bounds* library as required by the remedial plan. Defendants argue that the mini-law libraries are a concept contemplated by the remedial plan. This is true only with respect to prisoners in segregation. However, both level I and level V prisoners are general population prisoners by Defendants' own admission.[8] The mini-law libraries are simply inadequate for conducting all but the most basic legal work (if they are properly maintained) and do not provide prisoners with adequate access without significant additional assistance.

Defendants' limits on legal assistance agreements render them wholly ineffective. If a level I or V prisoner needs to meet with a paralegal, which is necessary for most prisoners and all illiterate prisoners,[9] she must enter into a legal assistance agreement with a paralegal of the same custody level. This means that neither the inmate nor her paralegal has access to the main law library. If a

---

7. In fact, this is the position taken by the court of appeals in *Knop*. It stated:

 Standing alone, law libraries that are adequate for prisoners who know how to use them and who have reasonable physical access to their collections are not adequate for prisoners who cannot read and write English, or who lack the intelligence necessary to prepare coherent pleadings, or who, because of protracted confinement in administrative or punitive segregation or protective custody, may not be able to identify the books they need.

 \* \* \* \* \* \*

 We do not disagree with the conclusion, reached by ... the district courts, that something more was required in the way of paralegal assistance. It is fundamental that a prisoner who claims to be confined unconstitutionally must be allowed to state his case to a court. Some such prisoners, given law books and simplified pleading forms of the sort furnished by the courts, can handle the task adequately themselves. Others ... cannot. For prisoners of the latter sort, as a practical matter, there can be no meaningful access to the judicial system unless some literate person is available to reduce their stories to intelligible written pleadings.
 *Knop*, 977 F.2d at 1005–06.

8. *See* Tr. 2/15/96 at 149.

9. I have found that prisoner illiteracy is a serious and pervasive problem regarding court access. *See Hadix v. Johnson*, 694 F.Supp. 259, 284–85 (E.D.Mich.1988); *Knop*, 977 F.2d at 1006. *See also Johnson v. Avery*, 393 U.S. 483, 487, 89 S.Ct. 747, 750, 21 L.Ed.2d 718 (1969) ("Jails and penitentiaries include among their inmates a high percentage of persons who are totally or functional illiterate, whose educational attainments are slight, and whose intelligence is limited."); *Hooks v. Wainwright*, 775 F.2d 1433, 1435 (11th Cir.1985), *cert. denied*, 479 U.S. 913, 107 S.Ct. 313, 93 L.Ed.2d 287 (1986) (noting district court finding that Florida's prison population had "more than 50% rate of inmate functional illiteracy"); Steven D. Hinckley, *Bounds and Beyond: A Need to Reevaluate the Right of Prisoner Access to the Courts*, 22 U.Rich.L.Rev. 19, 43 (1987) ("[O]ver thirty percent of all prisoners have less than an eighth grade education, as opposed to only nine percent with less than an eighth grade education among the general population."); and Arturo A. Flores, *Bounds and Reality: Law books Alone Do Not a Lawyer Make*, 77 L.Libr.J. 275, 280, 282 (1984–85). Defendants appear to be conveniently oblivious to this reality.

level I or V prisoner wants her paralegal to have access to the main law library, she must presently utilize a level II paralegal. Such a cross-custody legal assistance agreement can only be conducted via institutional mails. This requirement renders the legal assistance useless to an illiterate inmate.

Notwithstanding these problems, the paging system established by Defendants was shown to be ineffective. First, an inmate must know with specificity what resource she wants in order to request it from the main law library. Second, inmates can borrow no more than five books at any one time and can keep them for only 24 hours. Third, while one inmate reported that she generally received requested books in one to two days, another testified that it generally took a week. Fourth, it was shown that it takes at least a week for a prisoner to ask her paralegal a question and receive its answer. Finally, copies of materials from the main library are only provided once a week. Limits such as these, which are inherent to a paging system, restrict access to the point where it is virtually devoid of value.[10] As the United States Court of Appeals for the Fourth Circuit has stated:

Simply providing a prisoner with books in his cell, if he requests them, gives the prisoner no meaningful chance to explore the legal remedies he might have. Legal research often requires browsing through various materials in search of inspiration; tentative theories may have to be abandoned in the course of research in the face of unfamiliar adverse precedent. New theories may occur as a result of a chance discover of an obscure or forgotten case. Certainly a prisoner, unversed in the law and the methods of legal research, will need more time or more assistance than the trained lawyer in exploring his case.

It is unrealistic to expect a prisoner to know in advance exactly what materials he needs to consult.

*Williams v. Leeke,* 584 F.2d 1336, 1339 (4th Cir.1978), *cert. denied,* 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979).

In regard to level V prisoners, there are other problems with the mini-law library. The collection in the Essex mini-law library does not even contain basic materials such as MDOC policy directives. Furthermore, use of this facility is limited to two inmates at any one time for no more than one hour periods. This limitation fails to even meet Defendants' own policies. Defendants own policy directive on institutional law libraries states that "[o]rdinarily, meaningful legal research cannot be performed in time periods of less than two hours." P.D. 05.03.115 at paragraph R.

Level IV prisoners are also denied effective and meaningful access to the courts. By scheduling virtually all prisoner activities for the same time, level IV prisoners must choose between use of the law library and the other prison activities. In fact, if a level IV inmate has a job detail or GED classes or participates in other court ordered programming and attends church on Sunday, she can only access the law library for three hours each week. This situation is also contrary to P.D. 05.03.115 which states that "[e]ach general population prisoner shall be entitled to at least six hours per week of law library use, in segments of not less than two hours each, unless a shorter time segment is requested by the prisoner and approved by the librarian or other civilian staff person in charge of the library." P.D. 05.03.115 at paragraph R. Defendants have also denied the requests of level IV prisoners for alternative times to access to the law library.[11]

---

10. *See Pembroke v. Wood County, Texas,* 981 F.2d 225, 229 (5th Cir.1993), *cert. denied,* 508 U.S. 973, 113 S.Ct. 2965, 125 L.Ed.2d 665 (1993); *Toussaint v. McCarthy,* 801 F.2d 1080, 1109 (9th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987); *Morrow v. Harwell,* 768 F.2d 619, 623 (5th Cir.1985); *Cepulonis v. Fair,* 732 F.2d 1, 4 (1st Cir.1984); *Williams v. Leeke,* 584 F.2d 1336, 1339 (4th Cir.1978), *cert. denied,* 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979).

11. Defendants did show that one level IV inmate had been given additional library time after she had used her weekly allowance of six hours. However, Defendants' willingness to permit a prisoner to use the law library for additional time during regularly scheduled hours does not address the problems created by a schedule in which so many activities occur in the same time period.

■ Defendants also argue that they have a legitimate security concern which justifies the limits they have imposed on access. Prisons may certainly regulate library use to preserve prison security. However, prison authorities cannot so limit access to adequate law libraries and legal assistance that they are rendered meaningless. The importance of the right to meaningful access cannot be overstated. *Casey v. Lewis*, 43 F.3d 1261, 1266 (9th Cir.1994), *rev'd on other grounds*, —— U.S. ——, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). "It is the right upon which all other rights depend." *Id.*

■ Defendants cite *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987), in support of their limits on access. In *Turner*, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." I again note that the standard which Defendants must meet in defense of contempt is not *Turner* but impossibility. A party found to violate a court order must show that compliance would be factually impossible and the party "could not possibly comply with the Court's order, despite making all reasonable efforts." *Citronelle–Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991). Defendants do not even attempt to argue that they can meet this requirement.

■ In addition, Defendants' segregation policy and the manner in which it has been applied are not reasonably related to legitimate penological interests. In *Turner*, the Supreme Court discussed several inquiries it deemed relevant in deciding whether a regulation is reasonable:

1. Is there a "valid, rational connection" between the regulation and the government interest said to be served by the regulation?

2. Are there alternative means of exercising the allegedly impinged constitutional right that remain available to inmates?

3. How does accommodating the asserted constitutional right impact on guards and other inmates and the allocation of prison resources generally?

4. Are there ready alternatives to the prison regulation?

*Id.* at 89–90, 107 S.Ct. at 2261–62. It is significant that the Court has stressed that *Turner's* "reasonableness standard is not toothless." *Thornburgh v. Abbott*, 490 U.S. 401, 414, 109 S.Ct. 1874, 1882, 104 L.Ed.2d 459 (1989); *see also Muhammad v. Pitcher*, 35 F.3d 1081, 1084 (6th Cir.1994).

Prison security is unquestionably a legitimate penological interest. However, Defendants' refusal to allow level I and V prisoners access to the main law library does not bear a rational connection to prison security. First, Defendants readily acknowledge that level I prisoners are not a security threat. While Defendants contend that level I prisoners could introduce contraband into the prison, the SCF warden could not recall a single incidence of this sort, in the library or elsewhere.

Second, and more importantly, the exceptions to Defendants' segregation policy have swallowed the rule. From the outset, the segregation policy had exemptions for all educational and vocational programming, the Warden's Forum, Prisoner Benefit Fund, and the Store Committee. Later came exceptions for sex offender and assaultive offender groups and outpatient mental health team group therapy. Defendants also sought and obtained additional variances with regards to Women's Legal Services and the prison industries. SCF subsequently received a blanket variance of P.D. 05.01.140.[12]

---

**12.** On December 26, 1995, P.D. 05.01.140 was modified by a memorandum from Kenneth McGinnis, Director of the Department of Corrections. It provides:

Paragraph ZZ of ... [P.D. 05.01.140] limits contact between prisoners of different security levels at multi-level facilities. Effective immediately, that paragraph is replaced by the following amended Paragraph ZZ:

Except at the Scott Correctional Facility (SCF), prisoners in multi-level facilities shall not be permitted to have contact with prisoners of a different security level except for the following reasons:
(1) To participate in academic or vocational training;
(2) To receive health care services, including mental health services provided by the De-

Hence, while prisoners of different custody levels now regularly mix at SCF for many purposes, including educational classes, vocational training, Warden's Forum, the Prisoner Benefit Fund, the Store Committee, sex offender groups, assaultive offender groups, mental health groups, kitchens, prison industries, work details, Women's Legal Services, and paralegal training classes, Defendants still contend that they must adhere to the policy in regard to library access for security reasons. Defendants' continued refusal to allow level I and V prisoners access to the main law library is an exaggerated response to its security concerns.

■ Finally, Defendants contend that Plaintiffs lack standing to pursue this motion, citing the recently decided *Lewis* case and arguing Plaintiffs have not shown widespread actual injury. In *Lewis,* the Supreme Court held that prisoners alleging a violation of their right to access must have standing, i.e., be able to show actual injury, in order to pursue their claim. *Lewis,* —— U.S. at ——–——, 116 S.Ct. at 2179–80. Apparently, Defendants believe that Plaintiffs must make such a showing to pursue their present motion.[13] Defendants have once again failed to grasp that these proceedings are for contempt. The validity of the original orders finding violations of Plaintiffs' rights of equal protection and access are not at issue and may not be collaterally attacked in these proceedings. Fed.R.App.P. 4(a)(1); *see also Cherokee Express, Inc. v. Cherokee Express, Inc.,* 924 F.2d 603, 607–08 (6th Cir.1991). Moreover, Plaintiffs clearly have standing to challenge Defendants' violations of this Court's remedial orders. Civil contempt proceedings are a supplemental part of the original action from which they stem. *D. Patrick, Inc. v. Ford Motor Co.,* 8 F.3d 455, 459 (7th Cir.1993); *see also* Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure,* § 1017 at 71 (1987). The remedial orders, which were proposed *by Defendants* as the manner by which they wanted to provide equal protection and access, were entered as relief for the entire Plaintiff class. Therefore, any member of the class has standing to challenge a violation of these orders in a contempt proceeding.

Even if this case was not in the procedural posture that it is, i.e., a motion for contempt for violation of prior court orders and violation of Defendants' own proposals for remedial relief, the concerns of the Court expressed in *Lewis* are not present in the facts of this case. The contempt alleged by the Plaintiffs addresses the Defendants' actions with regard to SCF alone. Plaintiffs seek remedial relief based on proofs of contempt as to that facility alone, and do not seek to extend relief system-wide as was the case in *Lewis.*

III. *Plaintiffs' Motion to Compel Law Library Access and Implementation of Inmate Assistance Agreements at Crane Women's Facility*

Plaintiffs also contend that access to the courts for prisoners at Crane Women's Facility ("CWF") is inadequate. These allegations are largely without merit. Only level II prisoners are incarcerated at CWF. Consequently, no prisoners are denied physical access to the law library because of the Department's segregation policy. Similarly, the limits on legal assistance agreements do not impact prisoners at CWF as they do at SCF.

The one meritorious aspect of Plaintiffs' motion as it relates to CWF concerns what Defendants consider "pending litigation". The meaning of this term determines admission to the law library and whether inmates can make photocopies. Some inmates are unclear or confused as to the meaning of the term "pending litigation" and the photocopying policy and contend that these policies are

partment of Health or the Bureau of Health Care Services Psychological Services;
(3) To participate in meetings of the Warden Forum, Prisoner Benefit Fund committee and Prisoner Store Committee.
Mixing of security levels at SCF and for the purposes listed above may be permitted only if the Warden determines that the services or function cannot be maintained unless prisoners of differing security levels are allowed to have contact. In all such cases where mixing of security levels is allowed, the Warden shall ensure that appropriate supervision is provided.

**13.** In fact, Plaintiffs did make such a showing. *See* Finding of Fact No. 51.

subjectively and arbitrarily applied. Tr. 1/23/96 at 151–53. Therefore, Defendants need to establish and provide to the court written policies regarding its definition of pending litigation and photocopying.

IV. *Plaintiffs Motion for an Order of Contempt Regarding Defendants' Denial of Programming Opportunities at Scott Correctional Facility*

In the *Glover I* and *Glover II* opinions, I concluded that Defendants were unconstitutionally denying programming to women incarcerated by the Department of Corrections. I consequently ordered Defendants to provide vocational, apprenticeship, and prison industry opportunities for women prisoners. At SCF, Defendants are presently required by court orders to provide six vocational programs. Order of May 18, 1992. In regards to apprenticeships, Defendants are required to provide five programs. *Glover*, 510 F.Supp. at 1021–22; *Glover*, 721 F.Supp. at 822; RP 4–2. Finally, Defendants are required to provide two prison industries, license tabs and cushions. *Glover*, 510 F.Supp. at 1022.

Plaintiffs argue that Defendants are in contempt of my orders in two respects. First, Plaintiffs contend that Defendants have unilaterally discontinued court ordered vocational programming. Second, Plaintiffs contend that Defendants are denying programming to prisoners at SCF on the basis of custody level.

A. *Findings of Fact*

Based upon the evidence presented during the evidentiary hearings, and pursuant to Federal Rule of Civil Procedure 52(a), I make the following findings of fact in regard to Plaintiffs' Motion for an Order of Contempt Regarding Defendants' Denial of Programming Opportunities at Scott Correctional Facility:

1. *Deviation from Court Ordered Vocational Programming*

(52) In December 1995, Defendants discontinued the auto mechanics vocational program. Tr. 2/15/96 at 169.

(53) There continues to be some prisoner interest in the auto mechanics vocational program. Tr. 2/16/96 at 23, 29.

(54) In December 1995, Defendants discontinued the building trades vocational program. Tr. 1/23/96 at 174; 2/15/96 at 171.

(55) Those prisoners who were detailed to the building trades vocational program when it was canceled were not given an option to complete the program. Tr. 1/23/96 at 178.

(56) It is Defendants' intent to replace the building trades vocational program with a pre-vocational program. Tr. 2/15/96 at 171.

(57) In December 1995, the instructor for the institutional maintenance vocational program resigned. Tr. 2/15/96 at 171.

(58) Due to their interest in changing its vocational programming, Defendants have not posted their need for an instructor for the institutional maintenance vocational program. Tr. 2/15/96 at 171.

(59) In May 1995, Defendants separated participants in the auto mechanics vocational program by custody level; level IV's attend the program in the morning and level II's attend in the afternoon. Tr. 2/15/96 at 45–46.

(60) Prisoner participation in the auto mechanics vocational program has been limited due to the Department's inability to transport participants to the Western Wayne Correctional Facility ("WWCF"). Tr. 2/15/96 at 48.

(61) In 1995, Defendants established a panel to conduct a review of the vocational programming at SCF. Defs.Ex. 2F; Tr. 2/15/96 at 90.

(62) The review panel concluded in June 1995 that many women at SCF were not ready for vocational programming and that they needed to conduct some pre-vocational training prior to enrollment in vocational programs. Defs.Ex. 2F; Tr. 2/15/96 at 94.

(63) The review panel recommended that the Department close the two Western Wayne vocational programs as well as Scott's custodial maintenance program and replace them with other options. Defs.Ex. 2F.

(64) The review panel also recommended that the three vocational programs it recom-

mended canceling should be replaced with (1) a pre-vocational program in building trades; and (2) a dental technician program. Defs. Ex. 2F.

(65) Defendants have established a ten-seat computer lab at SCF dedicated to the improvement of skills. Tr. 2/15/96 at 97.

(66) The computer lab at SCF is not a vocational program but a pre-vocational program. Tr. 2/15/96 at 97–98.

(67) In 1995 Defendants established a dental vocational program that continues to be operational. Tr. 1/23/96 at 250; Tr. 2/15/96 at 172.

### 2. *Denial of Programming Based on Custody Levels*

#### a. *Level I*

(68) Level I prisoners cannot participate in programming within SCF unless they waive their level I status, become level II, and live within SCF. Tr. 1/23/96 at 175; Tr. 2/15/96 at 192.

(69) Prior to the fall 1995, Level I prisoners were not allowed to participate in apprenticeship programs because of their custody level. Tr. 2/15/96 at 155.

(70) On January 11, 1996, there were two level I prisoners involved in vocational programming at SCF. Defs.Ex. 2C.

(71) On January 11, 1996, there were zero level I prisoners involved in apprenticeship programming at SCF. Defs.Ex. 2C.

#### b. *Level IV*

(72) Level IV prisoners were denied prison industry programming. Tr. 1/23/96 at 199.

(73) Level IV prisoners were denied the auto mechanics vocational program. Tr. 1/23/96 at 201.

(74) On January 11, 1996, there were 19 level IV prisoners involved in vocational programming at SCF. Defs.Ex. 2C.

(75) On January 11, 1996, there were zero level IV prisoners involved in apprenticeship programming at SCF. Defs.Ex. 2C.

#### c. *Level V*

(76) Prior to the fall of 1995, level V prisoners were not allowed to participate in apprenticeship programs because of their custody level. Tr. 2/15/96 at 157.

(77) Level V prisoners were denied vocational programming. Tr. 1/23/96 at 181; Tr. 2/15/96 at 162.

(78) Level V prisoners were denied prison industry programming. Tr. 1/23/96 at 182.

(79) On January 11, 1996, there were two level V prisoners involved in vocational programming at SCF. Defs.Ex. 2C.

(80) On January 11, 1996, there were zero level V prisoners involved in apprenticeship programming at SCF. Defs.Ex. 2C.

#### d. *Miscellaneous Findings*

(81) In January 1996, Defendants posted recruitment signs for prisoner industries which specified that only level II prisoners could apply. 1/23/96 at 192.

(82) Defendants' prerequisites for prisoner participation in vocational programming do not presently discriminate based upon custody level. Defs.Ex. 2A.

(83) Defendants' prerequisites for prisoner participation in prison industry programming do not presently discriminate based upon custody level. Defs.Ex. 2D and 2M.

(84) Level II prisoners can only attend the programming at Western Wayne in the mornings and level IV prisoners can attend only in the afternoon. Tr. 2/15/96 at 45, 166–67.

(85) If level I or level V prisoners were to qualify for programming at Western Wayne, Defendants do not know when they would attend. Tr. 2/15/96 at 166–67.

### B. *Conclusions of Law*

#### 1. *Deviation from Court Ordered Vocational Programming*

I find by clear and convincing evidence that Defendants are in contempt of my orders requiring six vocational programs at SCF. There are only four vocational programs at SCF which are operational. Defendants admit that they have discontinued the

auto mechanics, building trades, and the institutional maintenance vocational programs.

Defendants contend that they are only required to provide three vocational programs coupled with other additional programs. Defendants' argument is based on my characterization of the orders regarding vocational programming at SCF in my March 14, 1995 opinion. I stated:

> Defendants have developed the dental lab program at Scott and a career vocational plan has been developed. Additionally, there are court-ordered programs at Crane and Scott in office occupations, graphic arts and food service; there are three other non-court ordered programs at Scott: institutional maintenance, auto mechanics, and building trades.

*Glover,* 879 F.Supp. 752, 759 (E.D.Mich. 1995). Defendants have seized upon my statement that "there are three other non-court ordered programs at Scott: institutional maintenance, auto mechanics, and building trades." Defendants argue that this language means that they are only required to provide three vocational programs. In order to appreciate the disingenuousness of Defendants' argument, my March 14, 1995 opinion must be placed into context.

Defendants were first ordered to expand their vocational programming in 1979. *Glover,* 478 F.Supp. at 1087. In that year, I held that the *five* vocational programs offered to women prisoners were of insufficient quantity and quality and ordered the Department to expand its vocational offerings to women inmates.[14] It is significant that in ordering Defendants to increase their vocational programs I left it to Defendants to determine the subject matter of the additional vocational programs.

In the ensuing years, Defendants refused to comply with my orders regarding vocational programming. In 1989, I held Defendants in contempt regarding vocational programming. *Glover,* 721 F.Supp. at 836–39. However, the United States Court of Appeals for the Sixth Circuit reversed my finding because it concluded that my 1979 order was no longer effective.[15] *Glover,* 934 F.2d at 712. In order to address this shortcoming, I required Defendants to create a remedial plan by which they pledged to be bound. RP 1–2.

As part of the remedial plan, Defendants submitted a vocational program plan entitled "A Plan for Vocational Programs and Work Pass" ("PVPWP"). In that document, Defendants committed to offer vocational training programs in the specific subjects of institutional maintenance, graphic arts, and food services. PVPWP at 2. In addition, Defendants committed to the development of additional vocational programs pending a survey of the prisoner population. PVPWP at 4 and 5. I note that these requirements are consistent with my continued belief that it is Defendants who can best determine what sort of programming will be effective.

In 1992, Plaintiffs filed a motion to enjoin the closing of the Huron Valley Women's Facility. Plaintiffs feared, among other things, that vocational programming would be interrupted or terminated if I permitted this move. In my Order of May 18, 1992 I stated:

> I decline to enjoin the transfer of women inmates to Scott on the basis that such programs would be interrupted, provided,

---

**14.** In *Glover I* stated:

> Training in five broad occupational areas is currently available at Huron Valley: office occupations, food service, graphic arts, building maintenance, and general shop....
>
> By way of comparison, male prisoners have access to some twenty different vocational programs, including automobile servicing, heating and air conditioning, machine shop, and drafting, among others. Furthermore, evidence was taken indicating that the "male" versions of those programs now being taught ... were often more extensive and more useful to the inmates....

> As a result of this evidence, I find that the women at Huron Valley are entitled to a greater variety of programming than they are currently offered. The actual courses to be added to those now taught, however, will depend on the results of the inmate survey.

*Glover,* 478 F.Supp. at 1086–87.

**15.** My 1979 order was superseded by my 1981 order. It omitted any specific remedies for vocational programs because they were being developed and were to be incorporated into a supplemental final order. *Glover,* 510 F.Supp. at 1020. No supplemental order was ever filed.

however, that the programs outlined in the letter I received from Director McGinnis dated May 7, 1992, and as discussed on the record at the May 14th, 1992 hearing are implemented forthwith.

The vocational programs outlined in that letter which are to be offered at Scott include business occupations, food service technology, graphic arts, auto mechanics to be provided at Western Wayne Correctional facility, building trades to be provided at the Western Wayne Correctional Facility, and institutional maintenance. Those programs must be operating by June 1st or June 8th as discussed at the hearing.

Significantly, in this order I specified the subject matter of three vocational programs in addition to the three I had specified in my earlier orders. However, I only specified what the Director of the Department of Corrections had suggested as the preference of the Department. With this order, Defendants had finally committed, however nominally, to increase vocational programming from the five programs offered in 1979.

It is against this backdrop that my March 14, 1995 opinion must be read. In that opinion, I concluded that Defendants' vocational programming still did not substantially comply with the PVPWP. *Glover*, 879 F.Supp. at 759–60. In stating that there were three, "non-court ordered" vocational programs at SCF, I was referring to the fact that the *subject matter* of the last three programs was not decided by the court. When Defendants were ordered to add business occupations, auto mechanics, and building trades vocational programming in 1992, they had selected the subject matter of these programs themselves. In making the statement at issue, I was noting that Defendants could not blame their continued failure to provide adequate vocational programming on an overly intrusive court.

Admittedly, my statement could be ambiguous to a person unfamiliar with the history of court ordered vocational programming at SCF. However, by no means does it serve as a basis for Defendants' decision to discontinue vocational programming. First, this statement is pure dicta and cannot possibly serve to modify an existing court order. A district court speaks only through its orders. *Glover*, 934 F.2d at 712. Second, Defendants' interpretation requires one to ignore the immediate and greater context of the statement. In regard to the immediate context, my March 14, 1995 opinion concluded that Defendants, in providing the six vocational programs, were still not substantially complying with my orders regarding vocational programs. If Defendants were not complying while providing six programs in 1995, how could they conclude that they would be in compliance by providing four in 1996? In regard to the greater context, it has been the clear and unequivocal requirement of this court and its orders that Defendants expand the quantity (and quality) of its vocational programming. To reduce the number of vocational programs can only be understood as contrary to my orders.

At best, my statement in the 1995 opinion can be said to establish some ambiguity as to court ordered vocational programming at SCF. However, Defendants have never sought a clarification or modification.[16] Defendants' failure to request such clarification or modification precludes them from raising any alleged ambiguity as a defense to contempt. *Glover*, 934 F.2d at 708–09.

Defendants' contention that the business occupations, auto mechanics, and building trades vocational programs were only "pilot programs" subject to unilateral cancellation is not accurate. In terminating these programs, Defendants have clearly violated my orders and are thereby in contempt.

---

**16.** Defendants did submit to the court what they termed "a current Plan for Vocational Programs" on February 29, 1996. In the cover letter to this document, Defendants submitted that they were providing this document at my request. In fact, I did not request the submission of a modified plan for vocational programming. During the February 15, 1996 evidentiary hearing, I asked Defendants to provide me with information on prisoner interest in the institutional maintenance and building trades programs at SCF. I also requested Defendants to respond to Plaintiffs' contention that building trades was a court ordered program at CWF. Interestingly, Defendants' submission addresses neither of these questions.

### 2. Denial of Programming Based on the Basis of Custody Level

██ I also find by clear and convincing evidence that Defendants have denied court ordered programming to level I, IV and V prisoners based upon their custody level. Defendants have so admitted. This was a clear violation of this court's orders requiring Defendants to provide vocational training, apprenticeships, and prison industries for all eligible women prisoners in Michigan. *Glover*, 478 F.Supp. at 1101–02; *Glover*, 510 F.Supp. at 1021–22.

Defendants' argument that their segregation policy required them to deny such programming is without merit. First, separation of custody levels does not mandate denial of programming. Second, Defendants' segregation policy has always included an exemption for vocational programming and later included an exemption for prison industries. Still later, Defendants received a blanket exemption from the segregation policy.

In concluding that Defendants have denied programming on the basis of custody level, I also note that Defendants claim and have provided some evidence that they are no longer doing so. Defendants have committed to permit level I, IV, and V prisoners who meet program eligibility requirements to participate in court ordered programming. By so doing, Defendants have purged this contempt. However, Defendants have admitted that they do not know how they would accommodate qualified level I and level V prisoners in programming offered at Wayne County Correctional Facility. Therefore, Defendants must present to the court a plan in which they specify how they will do so.

### V. Plaintiffs' Motion to Compel Compliance with this Court's Orders Regarding Camp Branch

As a part of its prison program, the Department of Corrections also utilizes camp facilities. Camps usually provide alternative, off-grounds programming to low custody prisoners likely to be released in the short term. The off-grounds programming includes public works [17] and work pass programs.[18]

The prescription of off-grounds programming as a cost-efficient means of providing rehabilitative opportunities to female prisoners has been an integral part of this case since its inception. My 1979 order and my 1981 orders required Defendants to provide work pass and public works programming at all prisons and camps housing members of the plaintiff class. PVPWP at 6. In 1989, I found the Defendants in contempt for "a continuing pattern of willful and intentional violations of ... [my work pass] orders." *Glover*, 721 F.Supp. at 829, 842. In the remedial plan, Defendants committed to continue these programs. PVPWP at 6–7.

Defendants are not required to provide college, vocational, or apprenticeship programming at the camps. However, the public works and work pass programs provided at the camp facilities are not intended to displace the educational, vocational, and apprenticeship programming available to qualified prisoners. It has been the long-standing commitment of Defendants that qualified prisoners who are placed in the camps may transfer to a facility providing court ordered educational, vocational, and apprenticeship programming not available in the camp.[19] In

---

17. Public works assignments enable qualified inmates having a level I or level II security classification to leave the camp on work crews comprised of other female offenders. All such public works assignments are supervised by the Department of Corrections.

18. The work pass program enables qualified inmates to work unsupervised in the community for a private employer.

19. The Department of Corrections first committed to transfer qualified inmates to facilities providing court ordered programming in a 1992 hearing. In that hearing, Director of the Department of Corrections Kenneth McGinnis made the following declarations:

> DIRECTOR McGINNIS: I think what they [Plaintiff class] are contending is that our new criteria [for public works and work pass programming] has abolished the program and all we are saying is we have not abolished the program, we have restricted access of certain offenders to those programs—
> THE COURT: Well, I agree with you that if an inmate who is in a camp is not eligible for either work pass or public works participation for the reasons you mentioned, then that, while that person may be in camp, could just as

addition, Defendants have committed not to transfer a prisoner pursuing educational, vocational, or apprenticeship programming to a facility where this programming would be interrupted. In June, 1994, I issued an interim order providing that "there shall be no transfer of any Plaintiff pursuing *Glover* program opportunities unless the transfer is to a placement where the plaintiff is able to continue without interruption her pursuit of the program." Interim Order Regarding Camp Branch of June 9, 1994.

Plaintiffs contend that Defendants are denying women in the camp system access to educational, vocational, and apprenticeship programming and that insufficient numbers of women are participating in work pass and public works. They argue that the "point and intent and spirit" of this court's orders establish that Defendants can not put people in the camp program who were pursuing court ordered programming or circumvent these orders by transferring prisoners directly from intake into the camp system without permitting qualified women to transfer to a facility with desired programming.

> easily be in prison and you may have them in camp because you don't have enough space in prison. There is really no difference between that inmate in the camp setting than the inmate in the prison setting.... Ms. LaBelle [Plaintiffs' class counsel] is saying if you are going to put them in camp you better give them what the inmates in prison are getting because they are the same, that is what she is saying.
>
> \* \* \* \* \* \*
>
> DIRECTOR McGINNIS: [W]e haven't forced any woman to go to camp. We give them the option if they so desire to participate in the other programming, to stay at Scott or stay at the Crane facility. As we go though this process, if there are women who are being excluded from both programs because of the new criteria and they want to return to those facilities, we will do that and then they will become accessible to the full range of the program.
>
> \* \* \* \* \* \*
>
> THE COURT: What is your reaction to that?
> MS. LaBELLE: My reaction, as to the women at Camp Gilman, if they can return to the Scott facility, I know a number of them will option that. You know, they went—obviously they went thinking that they would have work pass and it's not there.

Tr. 6/29/92 at 97–100. Later, in a subsequent hearing, Director McGinnis restated his commitment to the court:

Plaintiffs also contend that Camp Branch is overcrowded and that Defendants do not provide a life skills program at this facility.

## A. *Findings of Fact*

Based upon the evidence presented during the evidentiary hearings, and pursuant to Federal Rule of Civil Procedure 52(a), I find the following facts in regard to Plaintiffs' motion regarding programming at Camp Branch:

(86) As of 1/11/96, there were 310 prisoners at Camp Branch. Def. Ex. 6E.

(87) Prisoners within three years of their earliest release date ("ERD")[20] or within four years of their earliest release date having served two years are eligible for camp placement. Defs. Ex. 6A.

(88) If a prisoner is eligible for camp placement when she enters the correctional system, she will not be classified to any vocational or apprenticeship programming. Tr. 1/23/96 at 194.

> MS. LaBELLE: I think the only ... concern Plaintiffs have is the continuation of the issue regarding the women in the camp system who don't have access to college programming.
> MR. McGINNIS: And we're not going to provide access to women in the camp programming.
> THE COURT: No, but you will put them back in the prison system—
> MR. McGINNIS: Yes.
> THE COURT:—if they want to go.
> MR. McGINNIS: That's what we've done. We've repeatedly done that.

Tr. 10/21/93 at 35–36.

> In addition to Director McGinnis' sworn testimony, Nancy Zang, Special Administrator of Female Offender Programs, has also vowed that qualified and interested prisoners would be transferred for court ordered programming.
> MS. ZANG: [I]f there was an interest for vocational programming or college programming, we consistently said we would transfer women either to Crane or Scott depending on that interest and we've done that.

Tr. 7/30/92 at 52.

> Finally, I note that I have repeatedly represented my understanding of the commitment by the Department of Corrections. *See, e.g.,* Tr. 5/10/93 at 46. At no time have Defendants objected to this understanding.

**20.** A prisoner's earliest release date is the date at which a prisoner is first eligible for parole.

(89) As of December 19, 1995, the earliest release date for the population at Camp Branch was as follows:

(a) Approximately 200 inmates, or 62% of the population, had an ERD of 12 months or less;

(b) Approximately 85 inmates, or 27% of the population, had an ERD between 12 months and 24 months;

(c) Approximately 31 inmates, or 10% of the population, had an ERD between 24 months and 36 months;

(d) Approximately 2 inmates, or less than 1% of the population, had an ERD more than 36 months.

Def. Ex. 6D; Tr. 2/15/96 at 237–250.

(90) Approximately 20% of the prisoners at Camp Branch remain there beyond their ERD. Tr. 2/15/96 at 243.

(91) Defendants do not transfer prisoners from other facilities to Camp Branch if they are participating in vocational programming, apprenticeships, or Michigan Prison Industries. 2/15/96 at 232, 250.

(92) Defendants will transfer eligible prisoners from Camp Branch to other facilities for college programming. Tr. 2/15/96 at 232.

(93) Two prisoners have requested a transfer from Camp Branch for vocational, apprenticeship, or prison industry programming. Tr. 2/15/96 at 252.

(94) It is Defendants' policy not to transfer eligible prisoners at Camp Branch who request vocational, apprenticeship, or prison industry programming to a facility which provides these programs. Tr. 2/15/96 at 237.

(95) 115 inmates, or 36% of the population, have an ERD of more than twelve months and are not permitted apprenticeship, vocational, or prison industry programming. Tr. 2/15/96 at 250, 252.

(96) Prisoners who are eligible to be transferred directly into the camp system are allowed to apply for educational programming prior to their transfer to the camp system. Tr. 1/23/96 at 194.

(97) Prisoners who are eligible to be transferred directly into the camp system are not permitted to participate in vocational, apprenticeship, or prison industry programming, even if they have an ERD beyond twelve months.

(98) Defendants do not screen prisoners for eligibility to vocational or apprenticeship programming. Tr. 2/15/96 at 229, 231; Tr. 2/16/96 at 10.

(99) Defendants presently provide a work pass and public works programs at Camp Branch. Tr. 2/15/96 at 233.

(100) Defendants' work pass program was not established until after Plaintiffs' motion regarding Camp Branch was filed. Defs. Supp.Resp. to Plaintiffs' Motion to Compel Compliance at 4.

(101) There are presently 6 prisoners at Camp Branch involved in work pass. Defs. Ex. 6E. There is no waiting list at Camp Branch for work pass programming. Tr. 2/15/96 at 233.

(102) There are currently 136 women in the plaintiff class involved in public works. Defs.Ex. 6 and 6E. There is no waiting list at Camp Branch for public works. Tr. 2/15/96 at 233.

(103) Some prisoners at Camp Branch are ineligible for public works and work pass. Tr. 2/15/96 at 236.

(104) A prisoner could spend three years at Camp Branch and never be eligible for vocational, apprenticeship, public works, or work pass programming. Tr. 2/15/96 at 236.

(105) Defendants provide a life skills program at Camp Branch. Tr. 2/15/96 at 234.

B. *Conclusions of Law*

 There is clear and convincing evidence that Defendants are and have been in contempt of several my orders concerning camp facilities. First, by their own admission, Defendants were not providing a work pass program at Camp Branch prior to Plaintiffs' motion to compel compliance. It was only after the filing of this motion that Defendants implemented their work pass program at Camp Branch. The recentness of this program is evidenced by the fact that there are only six women participating in it, less than 2% of the population at Camp Branch. For purposes of comparison, I note

that when the remedial plan was approved in 1991, 29% of the prisoners in camp facilities participated in work pass. PVPWP at 6.

Defendants have fulfilled my order not to transfer prisoners from other facilities to Camp Branch if they are participating in court ordered programming. However, Defendants are in contempt of my order requiring Defendants to permit prisoners in camps to transfer from the camps to facilities providing vocational, apprenticeship, and prison industry programming. A significant number of women, roughly 38 percent of the population at Camp Branch, are not receiving court ordered programming even though their earliest release dates are more than a year away.[21] Defendants are also denying eligible women the opportunity to participate in court ordered programming by transferring new inmates directly to the camps without providing them the opportunity to enroll in court ordered programs. Defendants do not even screen new inmates who are camp eligible for court ordered programming.

Finally, Plaintiffs have failed to establish clear and convincing evidence that Defendants are in contempt regarding overcrowding or the omission of a life skills program at Camp Branch. Camp Branch is not overcrowded and it provides a life skills program.

## VI. *Plaintiffs' Motion for Contempt for Failure to Comply with Orders Regarding Apprenticeship Programs at Crane Correctional Facility*

Defendants are required to provide five meaningful apprenticeships at Crane Women's Facility ("CWS"). RP 4–2. In so doing, Defendants were required to identify staffing needs, the type of related instruction that would be needed and delivered, and the space and materials necessary. *Id.* Defendants were then to establish a monitoring plan to ensure that meaningful apprenticeships were implemented and maintained. RP 4–5.

The remedial plan also explicitly requires Defendants to recruit prisoners for the apprenticeships. *Id.* The mere posting of apprenticeship openings was held to be insufficient in my Opinion and Order of June 16, 1993. Defendants were specifically required to assist in motivating inmates to apply for apprenticeships. Opinion and Order of June 16, 1993.

For each apprenticeship, Defendants are required to provide on-the-job ("OTJ") training and 144 hours of related (i.e., academic) instruction. RP 4–2. In 1993, after concluding that Defendants were providing inadequate related instruction via correspondence courses, I ordered Defendants to provide related instruction through one of three methods: (1) classroom instruction; (2) community college; or (3) lectures. Opinion and Order of June 16, 1993 at 7.

In their motion, Plaintiffs contend that Defendants have failed to provide meaningful apprenticeships at CWF as ordered by this Court. Specifically, Plaintiffs contend that one of the apprenticeships has never been implemented, that the training in other apprenticeships is inadequate, that Defendants are not recruiting participants for the apprenticeships, and that Defendants do not adequately monitor the apprenticeship programs.

### A. *Findings of Fact*

Based upon the evidence presented during the evidentiary hearings, and pursuant to Federal Rule of Civil Procedure 52(a), I find the following facts in regard to Plaintiffs' motion regarding apprenticeship programming at CWF:

#### 1. *Electrician Maintenance Apprenticeship*

(106) The electrician maintenance apprenticeship has never been filled. Defs.App.Ex. 3.

---

21. During the hearing on May 9, 1996, I asked Nancy Zang, Special Administrator for the Department of Corrections, for the names of any prisoners at Camp Branch who would not be released within one year. In a letter of response dated May 22, 1996, Ms. Zang failed to provide any names but did acknowledge that there are women who would not be released within one year (i.e., by March 13, 1997). I also note that Ms. Zang again provided information that was not requested of her and that this information was therefore ignored in fairness to Plaintiffs.

(107) There have been six postings for the electrician maintenance apprenticeship: December 9, 1992–December 23, 1992; February 24, 1993–March 10, 1993; May 11, 1993–May 25, 1993; July 6, 1993–July 20, 1993; October 11, 1993–October 25, 1993; and March 14, 1994–March 28, 1994. Defs.App. Ex. 2.

(108) There is presently no supervisor for the electrician maintenance apprenticeship. Tr. 3/11/96 at 127.

(109) The electrician maintenance apprenticeship requires 8,000 program hours to be completed. Defs.App.Ex. 4 at Appendix C.

(110) It has been more than two years since the electrician maintenance apprenticeship was posted. Defs.App.Ex. 2; Tr. 3/15/96 at 30.

2. *Horticulture/Landscaping Gardener Apprenticeship*

(111) The landscape gardener apprenticeship was not operational from its inception in 1992 until January 25, 1996, after Plaintiffs filed the instant motion for contempt. Def. App.Ex. 2; Tr. 3/11/96 at 17.

(112) The only prisoner ever indentured to the landscape gardener apprentice was indentured on January 17, 1996. Defs.App.Ex. 3.

(113) The landscape gardener apprentice started her apprenticeship on January 25, 1996. Tr. 3/11/96 at 17.

(114) There have been six postings for the landscape gardener apprenticeship: April 9, 1993–April 23, 1993; July 6, 1993–July 20, 1993; October 11, 1993–October 25, 1993; March 14, 1994–March 28, 1994; June 29, 1995–July 13, 1995; and November 7, 1995–November 21, 1995. Defs.App.Ex. 2.

(115) The landscape gardener apprentice received 16 hours of OTJ for the month of February 1996. Tr. 3/11/96 at 17.

(116) The landscape gardener apprenticeship requires a total of 4,000 hours of OTJ training. Defs.App.Ex. 4 at Appendix D; Tr. 3/11/96 at 18.

(117) In the remedial plan, Defendants provided that the landscape gardener apprenticeship would take four years to complete. RP 4–3.

(118) The Defendants' "Apprenticeship and Training Standards for the Florence Crane Women's Facility" provide that apprentices should receive approximately 2,000 hours of training and instruction each year. Defs.App.Ex. 4.

(119) The landscape gardener apprentice's OTJ training consisted of picking up trash, cigarette butts, snow shoveling, and some turf management. Tr. 3/11/96 at 18–20.

(120) The OTJ training supervisor for the landscape gardener apprenticeship is frequently not present to supervise the apprentices' work. Tr. 3/11/96 at 18–19.

(121) The related trade instruction for the landscape gardener apprenticeship consists of independent work out of books and tests corrected by a teacher. Tr. 3/11/96 at 22–23.

(122) The landscape gardener apprentice supervisor is out on medical absence. Tr. 3/11/96 at 26, 144.

(123) On many days the landscape gardener apprentice is unable to work due to no fault of her own. Tr. 3/11/96 at 31.

(124) Although Defendants were aware that the landscape gardener apprentice was not receiving adequate supervision or work process hours, they took no steps to remedy this situation until after Plaintiffs filed for contempt. Tr. 3/1/96 at 24; Tr. 3/1/96 at 42–44.

(125) The landscape gardener apprenticeship is required to included four days of OTJ training from 8:00 a.m.–3:30 p.m. and one day of class related instruction. Tr. 3/11/96 at 34.

3. *Building Maintenance Apprenticeship*

(126) The building maintenance apprenticeship was not operational from its inception in 1992 until October 1995, after Plaintiffs filed the instant motion for contempt. Def.App.Ex. 2; Tr. 3/15/96 at 49.

(127) The only building maintenance apprentice was indentured October 5, 1995. Defs.App.Ex. 3.

(128) There have been seven postings for the building maintenance apprenticeship: December 9, 1992–December 23, 1992; April 6, 1993–April 20, 1993; May 11, 1993–May 25, 1993; July 6, 1993–July 20, 1993; October 11, 1993–October 25, 1993; March 14, 1994–March 28, 1994; and June 29, 1995–July 13, 1995. Defs.App. Ex. 2.

(129) The building maintenance apprenticeship requires 4,000 program hours to be completed. Defs.App.Ex. 4 at Appendix E; Tr. 3/11/96 at 42.

(130) The building maintenance apprentice received approximately 15 days of supervision from October 1995 to the end of December, 1995. Tr. 3/11/96 at 43.

(131) The supervisor for the building maintenance OTJ training spends most of his time outside of CWF and is unable to provide significant supervision. Tr. 3/11/96 at 43; Tr. 3/15/96 at 55.

(132) From October through December 1995, the building maintenance apprentice received no related instruction. Tr. 3/11/96 at 60, 66; Tr. 3/15/96 at 49.

(133) From January 1996 to the present, the related instruction for the building maintenance apprentice has consisted of individual study with occasional help from a supervisor. None of the book work has related to the work processes of the apprentice. Tr. 3/11/96 at 61.

(134) The building maintenance apprentice is supposed to be on the job Monday through Friday except Monday afternoons and Friday mornings. Tr. 3/11/96 at 65–66.

### 4. Institutional Cook

(135) There have been three institutional cook apprentices: March 17, 1993–March 28, 1994; November 1, 1994–October 24, 1995; and January 11, 1996–present. Defs.App.Ex. 2.

(136) There have been four postings for the institutional cook apprenticeship: December 9, 1992–December 23, 1992; March 30, 1994–April 16, 1994; July 19, 1994–August 2, 1994; and October 30, 1995–November 13, 1995. Defs.App.Ex. 2.

(137) The present institutional cook apprentice was indentured on January 11, 1996. Defs.App. Ex. 3.

(138) There was no posting prior to the January 11, 1996 filling of the institutional cook apprenticeship. Def.App.Ex. 2.

(139) The institutional cook apprenticeship requires 4,000 program hours to be completed. Defs.App.Ex. 4 at Appendix B.

(140) The materials for related instruction for the institutional cook apprenticeship are inadequate. Tr. 3/11/96 at 94.

(141) Related instruction for the institutional cook apprenticeship has consisted of individual book work. Tr. 3/11/96 at 85.

### 5. Computer Peripheral Equipment Operator Apprenticeship

(142) The peripheral equipment operator apprenticeship was first posted on February 19, 1993. Defs.App.Ex. 2.

(143) The first and present peripheral equipment operator apprentice was indentured on June 1, 1993. Defs.App.Ex. 3.

(144) The original peripheral equipment operator apprentice is still enrolled in the program. Defs.App.Ex. 2.

(145) The peripheral equipment operator apprenticeship requires 2,310 program hours to be completed. Defs.App.Ex. 4 at Appendix A.

(146) Supervision of the peripheral equipment operator apprenticeship was poor. Tr. 3/11/96 at 70.

(147) The supervision of the peripheral equipment operator apprenticeship has improved. Tr. 3/11/96 at 70.

(148) The peripheral equipment operator apprentice receives related instruction from Kellogg Community College. Tr. 3/11/96 at 73–74, 139.

### 6. Recruitment

(149) The remedial plan requires Defendants to recruit apprentices. RP 4–5.

(150) The standards Defendants developed for the apprenticeships at CWF require Defendants to recruit apprentices. Defs. App.Ex. 4 at § 6.

(151) The Defendants "communicate" vacancies in apprenticeships in four ways: a brochure upon arrival, an orientation packet upon arrival, posting on bulletin boards, and announcements during the 11 p.m. count. Tr. 3/11/96 at 104–06, 113; Tr. 3/15/96 at 4–6.

(152) Defendants keep no waiting lists of interested prisoners for apprenticeships. Tr. 3/15/96 at 37–38.

### 7. *Miscellaneous*

(153) Many women have responded to Defendants' posting of vacant apprenticeships and indicated interest in the apprenticeship programs. Def.App.Ex. 2; Tr. 3/15/96 at 92, 111.

(154) Defendants are responsible for setting the selection criteria for apprenticeships. RP at 4–5.

(155) If apprentices do not work on a given day, irrespective of fault, they are not paid. Tr. 3/11/96 at 20, 73.

(156) The apprenticeships require 144 hours of related instruction each year, or 2.8 hours per week. Tr. 3/11/96 at 32.

(157) An apprentice should work roughly 2,000 hours per year. RP at 4–2.

(158) Applicants for apprenticeships must not have had a major misconduct within 90 days of application. Tr. 3/1/96 at 121.

(159) Defendants never moved to substitute alternative apprenticeships for the existing apprenticeships. Tr. 3/15/96 at 33.

(160) Defendants explored the possibility of establishing alternative apprenticeships to those presently selected. Tr. 3/15/96 at 30–33.

(161) Defendants selected three potential alternative apprenticeships, paralegal assistant, college clerk, and program assistant, but none of these appears in the Dictionary of Occupational Title and were rejected by the Bureau of Apprenticeship and Training. Tr. 3/11/96 at 128; Tr. 3/15/96 at 130–33.

### B. *Conclusions of Law*

 Defendants have been shown, once again,[22] to be in clear and obvious contempt of my orders regarding apprenticeship programming at CWF. Simply stated, Plaintiffs have neither the quantity nor the quality of apprenticeships that I have ordered. This is at least the fourth instance in which I have so concluded. Not surprisingly, *not one inmate has completed an apprenticeship* at Crane since they were first ordered.

Defendants are not providing five meaningful apprenticeships as ordered. The electrician maintenance apprenticeship has *never* been filled. At the time Plaintiffs filed this motion, the landscape gardener and building maintenance apprenticeships had also *never* been filled. In a manifest scramble, Defendants filled these apprenticeships in January 1996 and October 1995, respectively. However, while Defendants have very recently indentured an inmate in each of these apprenticeships, the quality of these apprenticeships is wholly lacking.

The OTJ training and related instruction for the landscape gardener is inadequate. In February 1996, the only full month of the apprenticeship, the landscape gardener apprentice received less than sixteen hours of OTJ training. At this rate, it would take an apprentice twenty years to complete this 4,000 hour apprenticeship. Significantly, most of the OTJ training was spent picking up trash and cigarette butts and shoveling snow. Furthermore, the OTJ training supervisor for the landscape gardener apprentice was frequently not present while the apprentice did her work. He is also now on a medical leave. Finally, the related instruction for the landscape gardener consists of independent book work—contrary to my clear orders of instruction via lectures, community college programs, or classroom instruction.

The building maintenance apprentice received only fifteen days of OTJ supervision from October 1995 through December 1995. At this rate, the building maintenance apprentice would complete her apprenticeship

---

22. Defendants were previously found in contempt regarding apprenticeship programming in 1989, 1993, and 1995. See *Glover*, 721 F.Supp.

at 839, *Glover*, Opinion and Order of June 16, 1993, and *Glover v. Johnson*, 879 F.Supp. at 758.

in "only" ten years. Again, the supervisor for this apprentice was often absent. During this same period, the building maintenance apprentice received no related instruction. Since January 1996, the related instruction has consisted of individual study from books with occasional help from the supervisor. None of the related instruction has related to the apprentice's OTJ training.

The quality of the other apprenticeships is uneven. The best apprenticeship is the computer peripheral equipment operator apprenticeship. The supervision of this apprentice has improved and she receives her related instruction from Kellogg Community College. The institutional cook apprenticeship has been filled on three separate occasions. However, the materials for the related instruction and the quality of the related instruction are inadequate. Finally, there has never been a electrician maintenance apprentice; it is therefore impossible to know what quality the OTJ and related instruction would be. It is known that presently there is no supervisor for this apprenticeship.

Defendants are also required to recruit prisoners to the apprenticeship programs. Both the remedial plan and the standards Defendants developed for the CWF apprenticeship program make this clear. In 1993, I made it clear to Defendants that simple notification is not sufficient recruitment of inmates to apprenticeship programming. However, this is still the only means by which Defendants seek to fill the apprenticeships. Periodically, Defendants have posted announcements of apprenticeship openings. Defendants also claim that they provide notice when inmates arrive in the correctional system and to CWF via a brochure and orientation packet.[23] Defendants have also announced apprenticeship vacancies during the 11:00 p.m. count at the prison. All of these methods are passive and merely notify inmates of openings. This is the very method I have previously held does not constitute recruitment.[24]

Even if notification was adequate recruitment of apprentices, Defendants would still be in contempt. It has been more than two years since Defendants noticed the opening in the electrician maintenance apprenticeship. Prior to filling the landscape gardening apprenticeship in January 1996, it had been 14 months since the opening in this apprenticeship had been posted. Interestingly, Defendants filled this apprenticeship in January 1996 without having posted its vacancy. This suggests two conclusions: (1) Defendants themselves realize the futility of posting to fill vacant apprenticeships; and (2) when Defendants want to fill an apprenticeship (usually just before a contempt hearing), they can. Defendants also keep no waiting lists for apprenticeships.

Defendants argue that they have tried but simply cannot comply with my orders regarding apprenticeships at CWF. I find Defendants' argument of impossibility to be without merit. A party asserting impossibility must show "that they have made in good faith all reasonable efforts to comply." *Citronelle–Mobile Gathering, Inc. v. Watkins,* 943 F.2d 1297, 1301 (11th Cir.1991). As demonstrated in my findings of fact and the discussion above, Defendants have shown neither good faith nor a reasonable effort at compliance. The words I wrote in 1989 are still applicable:

[The] testimony provides another example of the difficulty I encounter when trying to enforce my orders.... My orders are ignored until a hearing date is set; the Department then embarks on a whirlwind of activity directed towards achieving a semblance of compliance. In court, the Department is all promises—compliance is always just around the corner: the pocket parts for the library are on order and will be in place shortly; new educational, vocational, and apprenticeship programs are about to be offered. When I stay my hand, the Department invariably defaults

---

**23.** However, five of the six inmates who participated in these hearings testified that they never received this information.

**24.** Nancy Zang, Special Administrator of Female Offender Programs, whose specific job it is to ensure that the Department is complying with this court's orders, acknowledged having received several documents which describe proactive methods of recruitment. *See* Tr. 3/15/96 at 21.

on its promises. The Department is interested in compliance only when it knows that it will have to answer to this court.
*Glover,* 721 F.Supp. at 831–32.

■■ Defendants have also suggested that the apprenticeships they proposed, and especially the electrician maintenance apprenticeship, may not be appropriate to a prison setting and that this somehow excuses their intransigence. I will note that Defendants themselves selected the five apprenticeships presently offered at Crane and they have never moved to modify the remedial plan or the pertinent court orders.

## VII. *Remedies and Sanctions*

■■ Based upon the testimony and exhibits presented in the evidentiary hearings, no other conclusion can be drawn but that Defendants have clearly, positively, and repeatedly violated orders of this court. This is not the first time that I have reached this conclusion. In fact, in the nineteen years of this case, Defendants have demonstrated a galling pattern of disrespect for the inmates they hold, the taxpayers of the State of Michigan, and the dignity of this court.

I have tried in vain to work with the parties, and especially the Defendants, to bring about a resolution of this dispute. I have negotiated orders with the Defendants; I have permitted Defendants to devise their own plan to remedy the problems in the women's prison system; and I have tried to establish a nonadversarial committee to reach compliance. Nevertheless, "defendants persist through bureaucratic inertia, intransigence, and resistance in denying female inmates ... [their constitutional rights]." *Glover,* 659 F.Supp. 621, 622 (E.D.Mich.1987).

In prison litigation cases, the judicial remedy may not overly intrude into the administration of the prison system. *Casey,* 43 F.3d at 1270. However, the remedy must ultimately be effective. *Id.* To encourage future compliance, there must be a cost to Defendants' contemptuous actions. At this juncture in these proceedings, in conjunction with several new remedial orders, I see no alternative to stimulate compliance but to impose significant monetary contempt sanctions. Therefore, in light of my findings of fact and conclusions of law, I hereby order the following relief with respect to Plaintiffs' motions:

A. *Plaintiffs' Motion to Compel Law Library Access and Implementation of Inmate Assistance Agreements at Scott Correctional Facility*

Effective Friday, July 26, 1996, Defendants shall be assessed a fine of $500 per day until compliance with all court orders regarding access to the courts is achieved. Effective October 1, 1996, the fine shall increase to $5,000 per day. Defendants shall pay the fine on a weekly basis, to the Clerk of the Court in Detroit, Michigan. Defendants may purge their contempt by achieving compliance with all court orders regarding access. At such time as Defendants or Plaintiffs believe that Defendants have achieved full compliance with the requirements of the Court's orders, either party may apply to the court to terminate the sanctions.

B. *Plaintiffs' Motion to Compel Law Library Access and Implementation of Inmate Assistance Agreements at Crane Women's Facility*

Defendants are ordered to submit by August 30, 1996, its policies regarding pending litigation and prisoner access to the library at CWF, including the procedures for legal photocopies.

C. *Plaintiffs' Motion for an Order of Contempt for Defendants' Denial of Programming Opportunities to Members of the Plaintiff Class Based Upon Custody Level*

Effective Friday, July 26, 1996, Defendants shall be assessed a fine of $500 per day until compliance with all court orders regarding vocational programming at SCF is achieved. Effective October 1, 1996, the fine shall increase to $5,000 per day. Defendants shall pay the fine on a weekly basis, to the Clerk of the Court in Detroit, Michigan. Defendants may purge their contempt by achieving compliance with all court orders regarding vocational programming. At such

time as Defendants or Plaintiffs believe that Defendants have achieved full compliance with the requirements of the Court's orders, either party may apply to the court to terminate the sanctions.

Defendants are further ordered to continue to permit prisoners, irrespective of custody level, to participate in all court ordered vocational, apprenticeship, and prison industry programs.

Defendants are further ordered, given their inability to specify when qualified level I and level V prisoners could attend programming at Western Wayne Correctional Facility, to present to the court a plan in which they expressly provide how and when programming will be provided at Western Wayne to all custody levels.

D. *Plaintiffs' Motion to Compel Compliance with this Court's Orders Regarding Camp Branch*

Defendants are ordered to maintain effective and meaningful work pass and public works programming at camp facilities and to maximize prisoner participation in these programs.

Defendants are further ordered to accommodate eligible inmates who are incarcerated in camp facilities and who desire court ordered educational, vocational, apprenticeship or prison industry programming by transferring such inmates to facilities providing these programs. Defendants are also ordered to effectively inform inmates in camps of these program opportunities so that inmates can take full advantage of them. Defendants must submit to the court in writing how they will accomplish these requirements no later than August 30, 1996.

Defendants are further ordered to screen new inmates who are camp eligible inmates for all court ordered programming—educational, vocational, apprenticeship, and prison industry. Those inmates who meet the eligibility requirements of these programs are to be informed of these programming opportunities and are to be permitted to participate in such programming immediately after intake. Defendants are further ordered to submit in writing to the court how

they will accomplish these requirements no later than August 30, 1996.

E. *Plaintiffs' Motion for Contempt Sanctions for Defendants' Failure to Comply with Court Orders Regarding Apprenticeship Programs*

Effective Friday, July 26, 1996, Defendants shall be assessed a fine of $500 per day until compliance with all court orders regarding apprenticeship programming at CWF is achieved. Effective October 1, 1996, the fine shall increase to $5,000 per day. Defendants shall pay the fine on a weekly basis, to the Clerk of the Court in Detroit, Michigan. Defendants may purge their contempt by achieving full compliance with all court orders regarding apprenticeship programming. At such time as Defendants or Plaintiffs believe that Defendants have achieved full compliance with the requirements of the Court's orders, either party may apply to the court to terminate the sanctions.

Conclusion

This case is nearly twenty years old. In my March 1995 opinion, I openly raised the question of finality. I acknowledged my interest in the conclusion of this case and the problems that arise when a federal court is unnecessarily involved in the work of a state agency. I concluded that when Defendants had substantially complied with the remedial plan, my involvement in the case would cease. It is my hope that monetary sanctions will provide the impetus for compliance and finality that my other approaches have not.

IT IS SO ORDERED.